*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| SHERRY R., | ) | |
| | ) | Supreme Court No. S-15376 |
| Appellant, | ) | |
| | ) | Superior Court No. 4FA-09-00122 CN |
| v. | ) | |
| | ) | O P I N I O N |
| STATE OF ALASKA, | ) | |
| DEPARTMENT OF HEALTH & | ) | No. 6949 – August 29, 2014 |
| SOCIAL SERVICES, OFFICE OF | ) | |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| _____ | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Michael A. MacDonald, Judge.

Appearances: Dianne Olsen, Law Office of Diane Olsen, Anchorage, for Appellant. David A. Wilkinson, Assistant Attorney General, Fairbanks, and Michael C. Geraghty, Attorney General, Juneau, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

STOWERS, Justice.

## I.    INTRODUCTION

Sherry R. appeals the termination of her parental rights to her son Jake.[1] She challenges the superior court's rulings that: (1) she failed to remedy the conduct that

---

[1]    Pseudonyms have been used to protect the privacy of the family members.

made Jake a child in need of aid (CINA); (2) the State of Alaska, Department of Health and Social Services, Office of Children's Services (OCS) made reasonable efforts to reunify her with Jake; and (3) termination of her parental rights was in Jake's best interests.

The record amply supports the superior court's decision to terminate Sherry's parental rights. We affirm.

## II.    FACTS AND PROCEEDINGS

Sherry is the mother of Jake and his twin sister Karen.  We affirmed the termination of Sherry's parental rights to her four older children in 2003.[2]

### A.    The Prior Termination Proceeding Involving Sherry's Four Older Children

In the prior case we observed that Sherry had "struggled with drug and alcohol abuse for many years," participating in seven separate treatment programs between 1996 and 2001 but completing just two.[3]  Sherry renewed her drinking and use of crack cocaine following her successful completion of the first residential treatment program in 1999.[4]  We observed that while Sherry "recognize[d] that she has had problems with alcohol," she continued to "relapse[] . . . a number of times."[5]  We also observed that Sherry's sobriety was "a relatively new phenomenon in her life," and while we echoed the superior court's commendation of Sherry's progress, we affirmed that this

---

[2]    *See Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 74 P.3d 896, 897 (Alaska 2003).

[3]    *Id*. at 898.

[4]    *Id*. at 899-900.

[5]    *Id*. at 902.

progress was not sufficiently timely to demonstrate that Sherry remedied the conduct that placed her children in need of aid.[6]

Substance abuse was only one of the many challenges Sherry faced parenting her four older children.[7] She had relationships with men who were abusive, including with the father of her four older children, David E.[8] When Sherry met Jerry B., the father of Jake and Karen, he was a serious felony repeat-offender who had spent 30 years in and out of prison, including for sexually abusing a minor.[9] Even after learning of Jerry's conviction for sexual abuse of a minor, Sherry was reluctant to sever ties with him.[10] Sherry also failed to demonstrate her acceptance or understanding of her older children's special needs and disabilities, in spite of being confronted with evidence that three of them suffered from alcohol-affected diagnoses likely brought on by Sherry's consumption of alcohol during her pregnancies.[11]

## B.    The Current Termination Proceeding Involving Jake

This appeal challenges the termination of Sherry's parental rights to Jake, born July 19, 2003. Jake is now 11 years old and has been in and out of institutional facilities since November 2009. OCS first took legal custody of Jake and his twin sister Karen on March 1, 2004, when the children were close to a year old. According to Sherry, Jerry called OCS because Sherry was "smoking crack"; but both children

---

[6]    *Id*. at 902-03.

[7]    *Id*. at 903.

[8]    *Id*. at 897, 900, 903.

[9]    *Id*. at 900.

[10]    *Id*.

[11]    *Id*. at 903.

remained in Sherry's home, and OCS provided substance abuse referrals, visits from a public health nurse, and child protection day care. The twins were removed from Sherry's physical custody a month later after police were called to her home following a domestic disturbance. Sherry had "blacked out" and later assaulted a police officer who had arrived on the scene to assist; subsequent testing revealed Sherry had a blood alcohol content of .354%.

OCS instituted a case plan for Sherry and attempted trial visits for her with the twins; it provided substance abuse evaluations, substance abuse treatment, counseling, random urinalysis, child care, and other services during this time. Two trial visits in February 2005 and October 2005 resulted in the children's removal — the first time because Sherry tested positive for cocaine, and the second time because Jerry returned home to find Sherry passed out drunk, Jake covered in feces, and Karen playing with a crack pipe. Jake and Karen remained in OCS's custody following this latest removal until OCS inexplicably transferred physical custody to Jerry in December 2006, despite his status as a convicted sex offender, and despite our prior opinion in *Sherry R.* clearly faulting Sherry for exposing her older children to Jerry.[12] In the words of the OCS case worker, OCS made this placement decision because Sherry's substance abuse made Jerry look like "a better choice for placement." OCS closed the original CINA case in December 2006 after it transferred custody to Jerry.

Jerry sexually abused Karen over the three years the twins were placed in his care, and currently is serving a long-term prison sentence for this crime. Six-year-old Karen disclosed the sexual abuse to OCS, and that disclosure prompted a re-opening of the twins' CINA case in September 2009. Jerry also terrorized Jake while Jake was in his care. Jerry hit Jake, grabbed him, swore at him unrelentingly, pushed him down

---

[12] *Id*. at 900.

stairs, and the superior court noted that it was "highly likely that [Jake] witnessed some . . . sexual abuse" of Karen by Jerry, such that Jake was "irreparably traumatized." Despite witnessing Jerry abusing Jake, and suspecting that Jerry was sexually abusing Karen as early as April 2009, Sherry did not report Jerry to OCS or law enforcement personnel; instead, she moved in with him and the children in June 2009.

Sherry retained physical custody of the children following Jerry's incarceration, and she lived with them in the Interior Alaska Center for Non-Violent Living shelter. In October 2009 OCS received a call from shelter personnel reporting that Jake was "acting out." OCS accompanied Sherry and Jake to the hospital, where she refused further treatment for him because he eventually calmed down.

But OCS was contacted by shelter personnel just a month later, this time because Jake was "out of control" with "some major behavioral issues."[13] Sherry admitted that she could not meet Jake's needs on her own. This time, Sherry chose not to accompany six-year-old Jake to the hospital. Jake spent a night alone in the Fairbanks hospital before being admitted to North Star Behavioral Health in Anchorage, where he stayed for two months. OCS filed an emergency petition for adjudication and for temporary custody upon Jake's transfer to North Star. OCS also drafted a case plan that required Sherry to complete urinalysis, attend therapy, engage in sober support systems such as Alcoholics Anonymous, and undergo substance abuse evaluations.

At North Star Jake was diagnosed with "posttraumatic stress disorder, attention deficit hyperactive disorder, oppositional defiant disorder, and pervasive developmental disorder." Jake continued to act out, including kicking and cursing at the

---

[13] Although Jake was throwing furniture, running through the halls, yelling profanity, hitting walls, ripping papers and brochures off the walls and tearing them up, scratching and biting, and attacking Sherry and Karen, Sherry had to be "convinced" by the shelter to call OCS.

North Star staff, and he talked about killing himself. Sherry initially refused to approve medication for Jake and blamed others for his misbehavior.

In January 2010 Jake was transferred to the Residential Diagnostic Treatment Center in Fairbanks, and in March 2010 Sherry stipulated to Jake's adjudication and disposition as a child in need of aid due to abandonment, parental incarceration, and neglect.[14] Sherry also stipulated that OCS had been making reasonable reunification efforts, that custody with OCS was in Jake's best interests, and that OCS's case plan was appropriately tailored toward the reunification of the family.

OCS referred Sherry for psychological evaluation and updated her case plan to reflect that evaluation. OCS also referred Sherry for weekly sessions with a therapist, and encouraged her participation in the Resource Center for Parents and Children's family reunification programs. OCS continued to provide urinalysis for Sherry and refer her to sobriety support groups, including Alcoholics Anonymous and Changing Patterns.

Sherry did not complete the Changing Patterns sobriety support group, and she discontinued individual therapy after her first therapist moved away in June 2011 because she did not think the second OCS-referred therapist was "quite a good fit."[15] Sherry's progress at the Resource Center for Parents and Children was slow, and OCS was concerned that she was generally "overwhelmed" when it came to parenting her children.

In April 2011 OCS filed a petition to terminate Sherry's parental rights on the basis of her inconsistent attendance at Alcoholics Anonymous meetings, little progress in the reunification program at the Resource Center for Parents and Children, and her persistent failure to take responsibility for Jake coming into OCS custody. OCS

---

[14] *See* AS 47.10.011(1), (2), (9).

[15] This second therapist, Cathy Weeg, specialized in personality disorders.

held that petition in abeyance, however, because at that time Jake's behavioral problems were so severe that a skilled "[a]doption [placement] wasn't viable, placement . . . with [Sherry] wasn't viable, [and] guardianship wasn't viable."

Jake remained at the Residential Diagnostic Treatment Center until June or July of 2011. Sherry and Karen visited him about three to four times per week, but Sherry became "extremely frustrated" with the staff at the Center because, in her own words, "there are certain [staff there] . . . that don't deserve to have their jobs." Jake had periodic outbursts during Sherry's visits, and following one particularly bad visit Jake was so out of control he had to be sent back to North Star until his behavior and mood stabilized. Sherry did not agree with Jake's course of treatment at the Center, claiming that Jake was placed in a small room and locked up, and she didn't believe "that's ok at all to do to a child" because it "traumatize[d] him more" and added "insult to injury" being in a "seclusion room."

Jake was ultimately transferred to Jasper Mountain, a residential treatment center in Oregon. Sherry called Jake twice per week and had a weekly family therapy session via Skype; she received email feedback from Jake's therapist, Ryan Adams, following these sessions on how to effectively communicate and intervene to prevent Jake's meltdowns.[16] OCS also facilitated Sherry's participation in monthly team meetings on Jake's progress, either in-person at Jasper Mountain, or over the phone. In her emails to Adams, Sherry lamented that Jake "is never going to be a perfect child" and asserted that Jake was "tired of watching other children go home [while] he is still there." Sherry shared with Adams that she thought the Residential Diagnostic Treatment Center (Jake's last placement site) "used [all kinds] of stuff to keep him there seemingly

---

[16] Sherry alleges that she was not aware these video conferencing sessions were family therapy with specific goals in mind. Adams testified that he could not "think of a reason why [Sherry] would think that she [hadn't] been involved in family therapy."

forever . . . punish[ing] him for days." Adams later testified that Sherry was "inconsisten[t]" in her support of the adults in Jake's life — e.g. Jake's therapeutic foster family and the staff at Jasper Mountain — and Adams opined that this contributed to Jake not feeling "safe" and progressing slowly in his treatment. Adams testified that, despite Sherry's good intentions for Jake, she was "unpredictable with her mood," and often sided with Jake when he conflicted with authority figures, thus "unintentionally validat[ing] that [Jake] can act out with adults and not listen to their directions." In Adams's professional opinion, Sherry's inability to consistently "encourage [Jake] to follow directions from all the adults in his life" meant that she could not provide him with the emotional support he needed to move forward with treatment.

In August 2011, shortly after Jake was admitted to Jasper Mountain, Sherry took a hair strand test that was positive for cocaine and cocaethylene. Around this time the Resource Center for Parents and Children discontinued reunification services with Sherry. Sherry alleged that she and the Resource Center mutually agreed to discontinue services, but OCS was informed that Sherry was noncompliant, not making any progress, and didn't feel like "she was getting anything out of it."

In October 2011 OCS updated Sherry's case plan and referred her to a therapist, Cathy Weeg, who specialized in personality disorders. Sherry was also required to continue with her substance abuse services and to seek out permanent housing, as she had been living in the Center For Non-Violent Living shelter for over a year. As discussed previously, Sherry did not believe Cathy Weeg "was quite a good fit" and stopped attending sessions. And in February 2012 Sherry again tested positive for cocaine and cocaethylene; following this second positive test result Karen was removed from Sherry's physical custody. Sherry told nine-year-old Jake that Karen was removed because Sherry "had a test done and it said that [she] had been using drugs, so [OCS] put [Karen] with somebody to make sure that she's safe." Sherry was allegedly "baffled"

by these test results, told Jake she didn't "know how [the test results] happened," and continues to argue in the present appeal that she never stipulated to the reliability or accuracy of the results.

In March 2012 OCS referred Sherry to Dr. Marti Cranor for a psychological evaluation and parenting-capacity assessment. Dr. Cranor had evaluated Sherry in the prior CINA case involving her four oldest children. Dr. Cranor concluded that Sherry was highly deficient in the psychological and emotional characteristics required to parent her children, noting that she was highly emotional, demanding, distrustful, and brash. Dr. Cranor was concerned with Sherry's substance abuse, her tendency to relapse after months or years of sobriety, and her "entrenched denial" of her problems. Dr. Cranor estimated it would take approximately nine-and-a-half to thirteen years of treatment for Sherry to overcome her parenting deficiencies. At the time of the assessment Jake was nine; thus, assuming the lowest estimate was accurate, Jake would reach majority before Sherry would be deemed (in Dr. Cranor's assessment) competent to parent him, assuming Sherry participated in treatment.

OCS updated Sherry's case plan following Dr. Cranor's assessment; the update required Sherry to complete ongoing drug testing, family therapy, individual therapy, Alcoholics Anonymous meetings, and outpatient substance abuse treatment. Sherry was referred to outpatient substance abuse treatment at Hope Counseling, and she began attending individual therapy there with Valerie Gifford in August 2012. Gifford testified regarding Sherry's consistent attendance at, and admirable progress in, individual therapy, but admitted numerous times that she had never spoken directly to Jake's therapist, and had not worked with Sherry on how to adequately respond to and support Jake's treatment. Sherry began outpatient substance abuse treatment at Hope Counseling and was mostly consistent in her attendance at Alcoholics Anonymous meetings during this period.

In July 2012 OCS filed a second termination petition, citing Dr. Cranor's assessment, Sherry's inability to learn appropriate parenting skills, her ongoing substance abuse as evidenced by her recent positive drug test results, her confrontations with Jake's treatment staff at Jasper Mountain, and the disruptions her visits to Jasper Mountain caused Jake. In October 2012 OCS requested that Dr. Cranor provide an addendum to the March 2012 psychological evaluation and parenting-capacity assessment based on more updated information regarding the services provided to Sherry, her progress, and Jake's treatment. None of this additional information changed Dr. Cranor's opinion of Sherry's ability to parent Jake, because in her view Sherry "was not making progress in her therapy . . . in terms of being able to more effectively intervene with [Jake] when [his] behavior got out of control." In November 2012 another hair strand test administered on Sherry was positive for cocaine.

A termination trial was scheduled for January 2013, but the superior court continued the proceedings for two more months at Sherry's counsel's request. During this period, Sherry completed two parenting classes, and Karen was returned to Sherry's physical custody on a trial basis. Sherry also completed vocational rehabilitation and started a scrap metal salvaging business.

The termination trial took place in June 2013. The superior court found that Sherry's consistent positive drug test results and interference with Jake's treatment demonstrated her failure to remedy the conduct and conditions that made Jake a child in need of aid. The court found that OCS had provided years of counseling, parenting education, case planning, visitation, and encouragement and support — yet Sherry continued her drug use and angry and disruptive outbursts in spite of these reasonable efforts. Finally, the court found by clear and convincing evidence that termination was in Jake's best interests.

Sherry appeals.

## III. STANDARD OF REVIEW

In a CINA termination proceeding we review a superior court's factual findings for clear error.[17] Factual findings "are clearly erroneous if review of the entire record leaves us with a definite and firm conviction that a mistake has been made."[18] "Conflicting evidence is generally insufficient to overturn the superior court, and we will not reweigh evidence when the record provides clear support for the superior court's ruling."[19] "Whether a child is in need of aid and whether the parent failed to remedy the 'conduct or the conditions that placed the child at substantial risk' of harm are factual findings reviewed for clear error."[20] Best interests findings are also factual findings reviewed for clear error.[21] "Whether OCS made reasonable efforts to reunify the family is a mixed question of law and fact.[22] "When reviewing mixed questions of law and fact,

---

[17]    *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1103 (Alaska 2011) (citing *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008)).

[18]    *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 427-28 (Alaska 2012) (quoting *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1253 (Alaska 2010)) (internal quotation marks omitted).

[19]    *Id.* at 428 (quoting *Maisy W.*, 175 P.3d at 1267) (internal quotation marks omitted).

[20]    *Id.* (quoting *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 270 (Alaska 2011)) (internal quotation marks omitted).

[21]    *Id.* (citing *Christina J.*, 254 P.3d at 1104).

[22]    *Id.* (citation omitted).

we review factual questions under the clearly erroneous standard and legal questions using our independent judgment."[23]

## IV.    DISCUSSION

In order to terminate parental rights under AS 47.10.088, a superior court must find by clear and convincing evidence that:  (1) a child is in need of aid under at least one of the subsections listed in AS 47.10.011; (2) the parent has not remedied the conduct or conditions that caused the child to be in need of aid or that returning the child to the parent would put the child at substantial risk of physical or mental injury; and (3) OCS has made reasonable efforts to provide family support services to the child and to the parent.[24]   The court must also find by a preponderance of the evidence that termination is in the child's best interests.[25]

Sherry does not challenge on appeal that Jake is a child in need of aid. Thus, we only address the superior court's findings and conclusions on Sherry's failure to timely remedy her conduct, OCS's reasonable efforts, and Jake's best interests.

A.    **The Superior Court Did Not Err In Finding That Sherry Failed To Remedy The Conduct And Conditions That Made Jake A Child In Need Of Aid.**

In order to terminate parental rights, the superior court must find by clear and convincing evidence that the parent has failed, within a reasonable time, to remedy the conduct that placed the child at substantial risk of harm.[26]   In making this determination, the court may consider "any fact relating to the best interests of the child,"

---

[23]    *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1018 (Alaska 2009).

[24]    AS 47.10.088(a).

[25]    AS 47.10.088(c); CINA Rule 18(c)(3).

[26]    AS 47.10.088(a)(2); CINA Rule 18(c)(1)(A)(ii).

including: (1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs; (2) the amount of effort by the parent to remedy the conduct or the conditions in the home; (3) the harm caused to the child; (4) the likelihood that the harmful conduct will continue; and (5) the history of conduct by or conditions created by the parent.[27] "The superior court is entitled to rely on a parent's documented history of conduct as a predictor of future behavior."[28]

The superior court found by clear and convincing evidence that Sherry had not timely remedied the conduct or conditions that made Jake a child in need of aid. The court found that: (1) there were "not enough years left in [Jake]'s minority for [Sherry] to learn the skills necessary to become even a minimally adequate parent"; (2) the testimony of Sherry's treatment providers was not helpful because they were unaware of Jake's needs, her continued drug use, and her consistent undermining of Jake's treatment; (3) Sherry neglected Jake and continued to present a risk to his achieving adequate care due to her "antiauthority, disruptive personality" that had "interfered with [Jake]'s treatment throughout this case"; (4) this conduct would continue because Sherry had not remedied her drug abuse and her behavioral deficiencies, and thus could not handle the stresses of raising Jake as a special needs child; and (5) Sherry was "deeply . . . trapped" in a substance abuse cycle as evidenced by the history of the case.

Sherry argues that the superior court erred because it faulted her for not having "extraordinary parenting skills[] for a child that nobody was going to be able to parent without significant challenges." She asserts that, as a matter of constitutional law, her parental rights cannot be terminated without a finding of her unfitness at the time of

---

[27]     AS 47.10.088(b).

[28]     *Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 74 P.3d 896, 903 (Alaska 2003).

the termination trial, and that termination cannot be solely based on her child's needs. She argues that the court "ignored" the testimony of her treatment providers and erroneously relied upon events that occurred subsequent to the termination trial. Finally, Sherry avers that she had remedied her substance abuse at the time of trial, and "[e]ven if the [hair follicle test] results did accurately demonstrate drug use, the last positive test was on November 21, 2012, [and would] have reflected use no later than August 2012 . . . reflecting a substantial period of sobriety prior to the termination decision of November 5, 2013."

### 1. Sherry failed to timely remedy her persistent and active interference with Jake's treatment as a child with special needs.

A child's special needs, and the harm caused by a parent's failure to timely address those needs, have weighed heavily in our analysis of whether termination is in the child's best interests.[29] Jake unquestionably suffers from a host of psychiatric issues that require a high level of care — including "posttraumatic stress disorder, attention deficit hyperactive disorder, oppositional defiant disorder, and pervasive developmental disorder." The superior court did not solely focus on Jake's special needs when it discussed why Sherry had not timely remedied her conduct that made Jake a child in need of aid. The superior court carefully considered Sherry's "antiauthority, disruptive personality"; how she "interfered with Jake's treatment throughout this case"; and how this conduct prevented Jake from adequately progressing in treatment and trusting the highly trained professionals that provided him with round-the-clock care.

---

[29] *See, e.g.*, *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1119 (Alaska 2010) (finding that a mother's prioritization of her own needs before her children's needs, and her inability to provide the kind of consistent home that her children with special needs require, was sufficient evidence to support the trial court's holding that returning the children to the mother's care was likely to result in serious emotional or physical harm).

-14-                                                                        6949

The record in this case thoroughly supports these findings. The termination petition cited Sherry's "defiant, disruptive, and disrespectful . . . conduct at [Jake's treatment facility] . . . [where] her presence . . . is detrimental not only to [Jake]'s ongoing treatment, but also for the ongoing treatment of other children at the facility." This echoes the testimony of Dr. Cranor, who twice met with Sherry to perform, and then update, a parenting-capacity assessment, and observed that Sherry had "a lot of problems managing [Jake's] behavior . . . during [her] visits." Dr. Cranor noted that Sherry "tended to blame either other residents of the program or . . . [Jake's] treatment providers for his misbehavior." Dr. Cranor also discussed how Sherry is "a person who needs a lot of attention[,] . . . [is] pretty emotional[,] . . . . [and] doesn't tolerate criticism very well." Finally, Jake's therapist Ryan Adams testified at trial that Sherry was "inconsisten[t]" in her support of the adults in Jake's life, and this contributed to Jake not feeling "safe" and progressing slowly in his treatment. Adams testified that, despite Sherry's good intentions for Jake, she was "unpredictable with her mood," and often sided with Jake when he conflicted with authority figures, thus "unintentionally validat[ing] that [Jake] can act out with adults and not listen to their directions." In Adams's professional opinion, Sherry's inability to consistently "encourage Jake to follow directions from all the adults in his life" meant that she could not provide him with the emotional support he needed to move forward with treatment. We observe that Sherry exhibited similar behavior in her previous CINA case when she failed to demonstrate her acceptance or understanding of her older children's special needs and disabilities.[30]

Sherry's active undermining of the professionals who aimed to provide much-needed therapeutic care to Jake demonstrates a significant lack of insight into what

---

[30] *Sherry R.*, 74 P.3d at 903.

is required to parent a special needs child.[31]  We agree with the superior court's analysis that Sherry's own treatment providers could not assist the court in determining whether Sherry had ameliorated this harmful conduct.[32]  As the superior court noted, these individual care providers "were unaware of [Jake]'s needs[, and] they were unaware of [Sherry]'s consistently undermining [Jake]'s treatment."

### 2. Sherry failed to timely remedy her substance abuse issues.

In the prior CINA case involving Sherry's four older children, she argued that "because she had been sober for approximately one year prior to the termination trial, she ha[d] remedied, within a reasonable time, the conduct or conditions that put her children at risk of harm."[33]  In the present case she advances essentially the same argument:  that she remedied her substance abuse by the time of trial, and "[e]ven if the [hair follicle test] results did accurately demonstrate drug use" they also "reflect[] a substantial period of sobriety prior to the termination decision of November 5, 2013."

---

[31]  *See In re B.W.*, 651 S.E.2d 332, 341 (Ga. App. 2007) (discussing how a mother's drug addiction and lack of parenting training negatively affected her special needs son's need for permanency); *Matter of Welfare of D.D.K.*, 376 N.W.2d 717, 722 (Minn. App. 1985) (discussing how a father's chronic unemployment problem, insufficient maturity, and poor parenting skills would likely "prevent his being considered for custody of even an average child" — much less a child with special needs).

[32]  Sherry also asserts that the court erroneously relied on events that occurred subsequent to the termination trial.  The court cited evidence of Sherry's disruptive behavior "just prior to the termination trial" and after the trial to underscore that point that her conduct, as a global matter, "erodes [Jake]'s trust and progress" in therapy, and her "reactive personality prevents her from being able to work with the treatment providers [Jake] so desperately requires."  These findings were not erroneous, and the superior court did not erroneously rely on post-termination trial events in reaching them.

[33]  *Sherry R.*, 74 P.3d at 902.

The superior court did not err when it found that Sherry had not timely remedied her substance abuse issues. As we stated in the prior CINA case concerning Sherry's four older children, a superior court "is entitled to rely on a parent's documented history of conduct as a predictor of future behavior."[34] Sherry's pattern of behavior in the present case, going back to when Jake was first taken into OCS custody in 2004, demonstrates a cycle of addiction and drug abuse that continued until at least August 2012 based on Sherry's interpretation of her most recent positive hair follicle test result. That Sherry can demonstrate a possible period of sobriety prior to the termination decision in November 2013 does not compel our reversal of the superior court's factual finding on this ground. This finding was based on clear and convincing evidence of a number of recent positive drug test results, as well as Sherry's decades-long history of relapsing following completion of rehabilitation services.[35]

**B.  The Superior Court Did Not Err In Finding That OCS Satisfied Its Obligation Of Reasonable Efforts To Effectuate Reunification; We Agree With The Superior Court That OCS Unduly Prolonged These Efforts To Jake's Detriment.**

Before terminating parental rights, the superior court must find by clear and convincing evidence that OCS has made reasonable efforts to provide reunification between the parent and the child.[36] As part of these "reasonable efforts," OCS must identify, "actively offer," and refer the parent to family support services that will assist him or her in remedying the conduct or conditions in the home that made the child a

---

[34]    *Id*. at 903.

[35]    *Id*. at 902.

[36]    AS 47.10.088(a)(3).

child in need of aid.[37]  When making determinations under AS 47.10.086, "the primary consideration is the child's best interests."[38]  And the reasonableness of OCS's efforts "must be viewed in light of the entire history of services that the state ha[s] already provided."[39]

We have recognized that OCS maintains "some discretion in determining what efforts to pursue and whether the timing is reasonable."[40]  We have explained that OCS's efforts must "be reasonable, but need not be perfect."[41]  On the other hand, OCS's reasonable efforts should not unduly prolong and unnecessarily burden a child's need for permanency.  This may be a difficult balance to strike in cases like Sherry's.  We conclude that OCS failed to strike the appropriate balance in this case given Sherry's long history with drug and alcohol abuse and persistent failure to accept her children's needs and disabilities over the course of two separate CINA cases involving five children.  Notwithstanding this conclusion, the efforts OCS made satisfied its reasonable efforts obligations under AS 47.10.088(a)(3), as detailed in AS 47.10.086, as these statutes establish the minimum standards that OCS is required to meet.

---

[37]    AS 47.10.086(1)-(2).

[38]    AS 47.10.086(f).

[39]    *Erica A. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 66 P.3d 1, 7 (Alaska 2003)  (citing *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 990 (Alaska 2002)).

[40]    *Sean B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 251 P.3d 330, 338 (Alaska 2011) (citing *Jeff A.C., Jr. v. State*, 117 P.3d 697, 706 (Alaska 2005)).

[41]    *Audrey H. v. State, Office of Children's Servs.*, 188 P.3d 668, 678 (Alaska 2008) (citing *Jeff A.C., Jr.*, 117 P.3d (noting that while the state's efforts "were not exemplary, neither were they unreasonable") at 706).

The superior court found that OCS "heroically served [Jake]" and "hoped against reason that [he] could be . . . reunited with his sister and his mother." The court found — and we agree — that OCS did this "to a fault." The court determined that OCS "extended the time to provide services and fought for reunification," providing Sherry with "repeated . . . counseling, parenting education, case planning, visitation, encouragement, and support" — which Sherry met with "continued drug use and angry outbursts against the treatment providers."

Sherry argues that OCS failed to make reasonable efforts to provide effective family therapy or parenting classes specifically for a special needs child. She asserts that OCS did not provide her "with the same kind of training and supports as were provided to [Jake's therapeutic] foster family." Finally, Sherry asserts that OCS should have identified her substance abuse and made reasonable efforts to provide services to her.

OCS was well aware of Sherry's persistent substance abuse issues and failure to accept or comprehend the special needs of her children when it was first contacted in 2004 and the twins where placed in OCS custody.[42] OCS had been involved with Sherry's efforts to parent Jake since he was about a year old, or roughly nine years at the time of trial, and had been involved with Sherry and her four older children as far back as the 1990s.[43]

The current CINA case was re-opened in 2009 — four years prior to the termination trial. Over the course of the present case Sherry was referred to and

_____

[42]     *See Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 74 P.3d 896, 903 (Alaska 2003) (noting Sherry's long history of substance abuse and failure to recognize, understand, or accept her four older children's special needs and disabilities).

[43]     *Id.* at 897.

provided a myriad of services addressing her substance abuse, including sobriety support groups, individual therapy, testing, and outpatient substance abuse treatment. In addition, Sherry was provided with psychological evaluations, updated case planning services, and reunification services at the Resource Center for Parents and Children along with the family therapy specific to Jake's special needs that Jake's therapist, Ryan Adams, provided. Adams counseled Sherry on how to effectively communicate and intervene to prevent Jake's meltdowns.[44] And while Sherry argues that OCS did not provide her "with the same kind of training and supports" as Jake's therapeutic foster family, Sherry admitted at trial that she got feedback from Adams constantly; at trial she stated: "You know, we've talked many, many times and email each other back and forth quite frequently."

Notably, Dr. Cranor stated at trial that it "really stood out" that even though Sherry had "received a lot of services, [and] OCS got involved with [Jake and Karen] pretty early on in their lives[,] . . . the children . . . were [still] removed several times . . . [and] both . . . displayed significant behavioral problems at various points in time." When asked why these multiple disruptions were so detrimental to children, Dr. Cranor explained:

> [M]ultiple removals from the home, multiple placements, multiple transitions, [and] delayed permanence are harmful to children. . . . [I]f a parent has had multiple opportunities to try to change their behavior and yet the children have had

---

[44] Even though Sherry alleges that she was not aware that the Jasper Mountain video conferencing sessions were family therapy with specific goals in mind, emails from Adams to Sherry reveal that she was counseled to "focus on sending calm messages to [Jake] through your body and voice tone, " and not to "shy away from calling [Jake] on [his] issues . . . . [H]e needs to trust in the process of listening to adults," such that "if he starts arguing . . . tell him to back up, prompt him with the appropriate response to your direction, and run through it again."

to be removed over and over and over, you reach a point where the harm being done to the children by the removals outweighs any benefit that they're getting from . . . continued contact with their parents.

The detriment caused to Jake by OCS's prolonged reunification services to Sherry far outweighed the benefit Jake received from Sherry's continually disruptive contact. We echo the superior court's conclusion that OCS unreasonably "extended the time to provide services and fought for reunification," providing Sherry with "repeated . . . counseling, parenting education, case planning, visitation, encouragement, and support" — much to Jake's disadvantage in achieving a sense of continuity, structure, and permanency, even if adoptive placement was not an immediately viable option. Nevertheless, it is clear that OCS satisfied the requirements of AS 47.10.088(a)(3) to make reasonable efforts, and the superior court did not err in so finding.

C. **The Superior Court Properly Concluded That Terminating Sherry's Parental Rights Was In Jake's Best Interests.**

Before parental rights may be terminated, the superior court must also find by a preponderance of the evidence that termination is in the child's best interests.[45] In making this determination, the superior court may consider the same factors used to determine whether a parent remedied her conduct within a reasonable time, as set forth above: (1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs; (2) the amount of effort by the parent to remedy the conduct or the conditions in the home; (3) the harm caused to the child; (4) the likelihood that the harmful conduct will continue; and (5) the history of conduct by or conditions

---

[45]     AS 47.10.088(c); CINA Rule 18(c)(3).

created by the parent.[46] The court also may consider the presence or lack of favorable placements.[47]

The superior court found "by a preponderance of the evidence, indeed by clear and convincing evidence," that termination was in Jake's best interests. The court stated that Jake was "currently in the care of . . . highly skilled therapeutic foster parents" and "[b]y terminating [Sherry]'s parental rights and committing [Jake] to the Department of Health and Social Services, the court is aware that [Jake] may never find an adoptive home." However, the court believed "that future is better for [Jake] than returning to the certain harm he would suffer in [Sherry]'s care."

Sherry argues that the court's focus on Jake's return to her physical care is misplaced, as she did not request his immediate return to her care. She believes that the superior court did not adequately consider the importance of Jake's bond to her.[48]

---

[46] AS 47.10.088(b).

[47] *Sean B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 251 P.3d 330, 339 (Alaska 2011) (citing *Karrie B. ex rel. Reep v. Catherine J.*, 181 P.3d 177, 185 (Alaska 2008)).

[48] Sherry relies on the dissenting opinion in *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957 (Alaska 2013) (Carpeneti, J., dissenting), and *In re M.S.*, 898 N.E.2d 307 (Ind. App. 2008) in support of her argument. These cases are inapposite to the present appeal.

In *Thea G.*, we held that "[p]reserving [a drug addicted mother's] parental rights, in order to ensure maintenance of the children's ties to her, would continue to expose the children to [her] potentially dangerous behaviors and would deprive them of the chance to [achieve a measure of permanency]." 291 P.3d at 968. As in *Thea G.*, "in some cases a child's best interests require preserving rather than severing ties to an unfit parent. While such cases may exist, this is not one of them." *Id*. In *Thea G.*, as in the present appeal, the children had "been in OCS's custody — in effect, in limbo — for . . . years, waiting for [their mother] to act responsibly and step into her role as their parent."
(continued...)

The superior court carefully considered the evidence and found that termination was in Jake's best interests because Sherry consistently and actively inhibited his progress in treatment. The court believed this harmful conduct would continue because Sherry was incapable of comprehending and meeting Jake's needs. As discussed previously, the present case had been ongoing for years at the time of the termination trial, and according to Jake's therapist, paramount to Jake's development was his need to feel "safe" in the consistent presence of adults who acted as points of authority to orient him and control his chaotic moods and outbursts. The superior court was also entitled to rely on Dr. Cranor's assessment that Sherry was highly emotional, demanding, distrustful, and brash, and therefore was highly deficient in the psychological and emotional characteristics required to parent Jake. Because Jake's need for calm consistency in a structured environment was, and remains, paramount, we affirm the superior court's determination that termination was in Jake's best interests.

---

[48](...continued)
*Id*. We reject Sherry's argument that we should adopt the reasoning of the *Thea G.* dissent in the present appeal. *See id.* at 969-73.

In *In re M.S.*, a mother voluntarily sought out the help of the Department of Child Services and informed it that she was unable to control her special needs son or protect her other children from him. 898 N.E.2d at 309. The mother had no substance abuse problems and remained heavily involved in her son's life, participating in services, attempting trial visits, weekend visits, and overnight visits to achieve reunification. *Id*. The Indiana Court of Appeals found that "everyone who testified agreed that [the] Mother . . . did everything that was asked of her," *id*. at 311-12, and the problem appeared to be "[the child's] behavior rather than [the] Mother's parenting skills." *Id*. at 312. This is not an analogous case, as the superior court made clear findings on Sherry's deficiencies as a parent, her lack of timely remedial efforts, and her lack of progress in the services she did engage in.

## V.    CONCLUSION

For the reasons explained above, we AFFIRM the superior court in all respects.