NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| TERRY W., ) | |
| ) | Supreme Court No. S-19190 |
| Appellant, ) | |
| ) | Superior Court Nos. 3SW-21-00004/00005 |
| v. ) | CN |
| ) | |
| STATE, DEPARTMENT OF FAMILY & ) | MEMORANDUM OPINION |
| COMMUNITY SERVICES, OFFICE OF ) | AND JUDGMENT* |
| CHILDREN'S SERVICES, ) | |
| ) | No. 2106 – September 24, 2025 |
| Appellee. ) | |
| ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Seward, Lance Joanis, Judge.

Appearances: Renee McFarland, Assistant Public Defender, Anchorage, and Terrence Haas, Public Defender, Anchorage, for Appellant. Mary Ann Lundquist, Senior Assistant Attorney General, Fairbanks, and Treg Taylor, Attorney General, Juneau, for Appellee.

Before: Carney, Chief Justice, and Borghesan, Henderson, Pate, and Oravec, Justices.

## I.    INTRODUCTION

A father appeals the termination of his parental rights. He argues that the superior court erred by finding that he failed to remedy the conditions that placed his

---

\*      Entered under Alaska Appellate Rule 214.

children in need of aid. He also challenges the court's finding that the Office of Children's Services (OCS) made reasonable efforts to prevent the breakup of his family. Observing no error, we affirm the superior court's termination order.

## II.    FACTS AND PROCEEDINGS

Terry W. and Alisa W. have two children, Ira and Audie.[1] The younger child, Audie, was born on the side of a road in October 2021. When Audie arrived at the hospital she was "slightly hypothermic" and tested positive for methamphetamine, amphetamine, and opiates. At the time, Terry was in prison, having been convicted of federal drug distribution charges and a state charge of fourth-degree assault.

OCS petitioned for temporary custody in October 2021, and both children were eventually placed with foster parents. Ira — who was four years old at the time — was subsequently diagnosed with an adjustment disorder and attention-deficit/hyperactivity disorder. He was given medication to treat impulsivity and aggression. Audie received speech, physical, and occupational therapy. Audie also had regular appointments because she had been prescribed a cranial reshaping helmet that required periodic adjustments. Ira also had an individualized education program, and the foster mother suspected Audie might need one as well. All of the services the children received were initiated through OCS and the foster parents.

After Terry was released from prison in the summer of 2022,[2] OCS set up supervised videoconference visits with the children for half an hour twice a week. Terry was generally consistent in attending these visits, although at times he would talk over Ira, or he would get upset if Ira was not talking to him. OCS also arranged some supervised in-person visits, which "went really well" according to the caseworker. By the fall of 2022, the caseworker noted that Terry had made progress listening to and

---

[1]    We use pseudonyms to protect the family's privacy.

[2]    Terry remained on federal probation from this point through completion of the termination trial.

applying suggestions from the caseworker and communicating more effectively with Ira. By the spring of 2023, OCS had begun to plan unsupervised overnight visits for Terry and the children.

For the first unsupervised visit, OCS flew Terry from his home in Anchorage to Kenai, where the children were in foster care. The agency reserved a hotel room for one night for Terry and the children. The foster mother packed a bag, which included clothes for both children and infant Tylenol for Audie, who had a fever. An OCS caseworker passed on the foster mother's instructions to Terry regarding the proper infant Tylenol dosage for Audie. But when the children returned to the foster mother the next day, none of the clothing she had packed appeared to have been worn. She also found children's Tylenol and adult Nyquil in the bag, which made her concerned that Audie may have been given medicine that was not suitable for her age and weight; further, she was concerned that Terry had given Nyquil to Ira even though Ira wasn't sick.

Terry testified that he bought clothes for the children at Walmart, and also that he couldn't find the infant Tylenol, so he gave infant Nyquil to Audie instead. OCS also discovered that during the hotel visit, Terry left Audie alone in the hotel room while he went to a swimming pool with Ira. The caseworker referred to this visit as "a learning moment"; they "talked about it pretty extensively," and Terry "was very receptive to what [she] was saying."

The children had a second unsupervised visit with Terry at his home in Anchorage the following weekend. OCS had directed Terry not to allow contact between Alisa and the children, because Alisa had not been approved for unsupervised visitation. But after this visit, Ira reported that his mother had been there, and in fact, Terry had instructed Ira to keep it a secret. When the caseworker confronted Terry about this, he initially denied but later admitted that Alisa had been at his home when the children were there. Due to the concerns raised during the unsupervised visits, OCS reverted to supervised visitation between Terry and the children.

Terry relapsed and tested positive for fentanyl four times in the summer of 2023. The drug tests were conducted through Terry's federal probation officer, and OCS did not learn until much later that Terry had tested positive.[3] That winter OCS moved toward unsupervised visits again. In December OCS purchased a plane ticket for Terry to travel to Kenai for visitation. Terry never arrived, explaining to the caseworker that "he had bought a new car and it broke down in Fairbanks." But, in truth, Terry had been arrested in Fairbanks for driving under the influence, and Alisa was with him in the vehicle. At that time Alisa was still using controlled substances and was again pregnant by Terry.

Following his conviction for driving under the influence, Terry was sentenced to eight months at a halfway house and required to participate in substance abuse treatment. OCS developed a new case plan for Terry, which included three goals: abstaining from substance use, developing parenting skills, and generally demonstrating good judgment. Terry subsequently completed an integrated assessment, and he began an 18-week outpatient treatment program in March 2024. At some point after his conviction for drunk driving, Terry told the caseworker that he suspected he might have Fetal Alcohol Syndrome and that he had also previously been hospitalized with carbon monoxide poisoning.

In light of this new information, and Terry's consistent lapses in judgment, OCS referred him for a neuropsychological evaluation, in hopes that it might shed light on his cognitive functioning and help him develop strategies for better impulse control. The evaluation was scheduled for June 2024, a month before the date of the termination

---

[3] OCS had lifted its own drug testing requirement for Terry because he was already being tested through federal probation and was "having logistical difficulties with OCS's testing." However, OCS's decision was premised on the assumption that the agency would be immediately notified of any positive results, which did not occur.

trial. But the night before the evaluation, Terry was informed that the halfway house would not allow him to travel, and he was forced to cancel the appointment.

Terry completed substance abuse treatment and was scheduled to graduate in July. He also completed two parenting classes and one relationship class. About a week before the trial, Terry was cleared by his probation officer to move out of the halfway house and into his own home.

At the termination trial in late July, OCS presented testimony from both the current and prior foster mothers, Terry, a nurse practitioner who worked with Ira, the family's OCS caseworker, and three other OCS workers who had assisted with supervision during visits. The current foster mother testified that Audie had made enormous strides developmentally. She also testified that Ira was "doing a lot better than when he came into our home." The nurse practitioner testified about Ira's needs and emphasized the importance of compassion, limit-setting, and consistency in the children's lives. She also explained that Ira appeared to have bonded with his foster parents, calling them "mom" and "dad."

Terry also testified on his own behalf, and he called two of his treatment counselors as witnesses. One counselor testified that Terry was a "stellar" participant who "added enrichment to the conversations." Terry added that his last use of alcohol and fentanyl was in March 2024, roughly four months before trial, and his drug tests while in treatment were clean.

The superior court entered a decision on record the day after the termination trial ended, finding the children to be in need of aid due to neglect and substance abuse.[4] The court found that Terry had failed to remedy the conditions that placed the children in need of aid within a reasonable time and that OCS had made

---

[4] *See* AS 47.10.011(9), (10).

timely and reasonable efforts toward family reunification.[5] Therefore, the court terminated Terry's parental rights.[6]

Terry appeals.

## III. STANDARD OF REVIEW

" 'Whether [a] parent has remedied the conduct [that rendered the child in need of aid] is a factual determination best made by a trial court,' and therefore we review this question for clear error."[7] "[F]actual findings are clearly erroneous if review of the entire record leaves us with a 'definite and firm conviction that a mistake has been made.' "[8] "Whether OCS made reasonable efforts to reunify the family is a mixed question of law and fact."[9] "For mixed questions, 'we review factual questions under the clearly erroneous standard and legal questions using our independent judgment.' "[10]

## IV. DISCUSSION

A superior court may terminate parental rights only after finding by clear and convincing evidence that (1) the child is in need of aid, (2) the parent has not remedied within a reasonable time the conduct or conditions that placed the child in need of aid, such that returning the child to the parent would place the child at risk of harm, and (3) OCS has made reasonable efforts toward reuniting the family.[11] The

---

[5]     *See* AS 47.10.086(a).

[6]     The court terminated both Terry's and Alisa's parental rights, but the termination of Alisa's parental rights is not at issue in this appeal.

[7]      *Joy B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 382 P.3d 1154, 1162 (Alaska 2016) (quoting *Shirley M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 342 P.3d 1233, 1240 (Alaska 2015)).

[8]     *Id.* (quoting *Chloe W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 336 P.3d 1258, 1264 (Alaska 2014)).

[9]     *Id.* (quoting *Sherry R. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 332 P.3d 1268, 1273-74 (Alaska 2014)).

[10]     *Id.* (quoting *Sherry R.*, 332 P.3d at 1274).

[11]     AS 47.10.088(a).

court must also make a finding by a preponderance of evidence that termination is in the best interests of the child.[12]

On appeal, Terry does not challenge the superior court's findings that the children were in need of aid or that termination was in their best interests. Instead, he argues the court clearly erred by finding that he failed to remedy the conditions that placed his children in need of aid. He also challenges the court's finding that OCS made reasonable efforts toward family reunification. For the reasons explained below, we reject Terry's arguments and affirm the termination of his parental rights.

**A.  The Superior Court Did Not Clearly Err By Finding That Terry Failed To Remedy The Conditions That Placed His Children In Need Of Aid.**

When determining whether a parent has remedied the conditions that placed the child in need of aid, "the court may consider any fact relating to the best interests of the child, including (1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs; (2) the amount of effort by the parent to remedy the conduct or the conditions in the home; (3) the harm caused to the child; (4) the likelihood that the harmful conduct will continue; and (5) the history of conduct by or conditions created by the parent."[13]

Here, the superior court found the children were in need of aid because of their father's neglect and substance abuse. In determining whether Terry had remedied these conditions, the court appropriately considered the age and special needs of the children, the length of time the case had been open, Terry's long history of substance abuse and incarceration, and his risk of reincarceration. The court discussed Terry's failures during the unsupervised overnight visits, specifically mentioning the medication issue during the hotel visit and Alisa's presence at the Anchorage visit,

---

[12]  *See, e.g.*, *Bob S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 400 P.3d 99, 109 (Alaska 2017) (citing *Chloe W.*, 336 P.3d at 1270-71).

[13]  AS 47.10.088(b).

finding that it "tends to go towards lack of ability to provide normal care for a child." And while Terry had recently completed treatment, the court pointed out that he had repeatedly made poor decisions when outside of highly structured environments. Ultimately, the court found that while Terry had "made some strides, it's just too late."

Terry argues that the court's findings regarding his failure to remedy his neglect of the children seem to focus on the fact that he was incarcerated when the children were removed. That concern, he argues, has been remedied because he is no longer incarcerated and has secured stable housing, which was approved by his probation officer. He also has plans to arrange daycare, and he has a support system that he can rely on for help.

Terry also suggests the court erred by failing to credit evidence showing that his success in parenting classes and treatment "mitigated any risk presented by his past." For instance, "[t]o the extent the court relied on Terry's behavior during the overnight visits to suggest Terry failed to remedy the conduct resulting in the children's neglect," Terry argues that "the court erred in failing to consider [his] success in parenting classes." He also points to his success in substance use treatment as evidence that he has remedied his substance abuse.

We observe no clear error in the court's findings. The fact that Terry had very recently engaged with treatment, completed parenting classes, and tested negative for controlled substances in the months leading up to trial does not preclude a finding that he failed to remedy the conduct or conditions that placed his children in need of aid.[14]

---

[14] *See Barbara P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 234 P.3d 1245, 1260-61 (Alaska 2010) (affirming trial court ruling that mother had failed to remedy because she had not internalized what she had been taught, despite complying with case plan, completing substance abuse treatment and parenting classes, and demonstrating nearly six months of sobriety); *Rick P. v. State, Off. of Child.'s*

Terry has consistently demonstrated poor judgment throughout the history of this case. His decision to leave Audie alone in the hotel room, his lack of awareness regarding Audie's medications, and his choice to allow Alisa to have contact with the children and then ask Ira to lie about it — all occurring during his first two unsupervised visitations — raise significant concerns. At the time of trial, any newly developed parenting skills had not yet been tested, and Terry's failure to employ such skills throughout the case supports the superior court's finding that he failed to remedy the conditions leading to the finding of neglect.

The same is true of the substance abuse finding. Terry has a history of substance abuse, and he had used substances as recently as March 2024, just a few months before the termination trial. He failed to submit to drug tests ordered by OCS following his drunk driving conviction, citing "logistical difficulties." True, Terry engaged with treatment for the first time in 2024, and he consistently tested negative for controlled substances while he was at the halfway house. But at the time of trial, Terry's sobriety was brand new, and he had not yet demonstrated that he could abstain from using substances outside of a controlled environment.

Terry also argues that the superior court erred to the extent it found that he failed to remedy his conduct within a reasonable time. He points out that there was no evidence presented that he had ever before undertaken, much less completed, intensive substance abuse treatment, such that his history provided little insight into the risk he posed after completing treatment. The amount of time that is reasonable to

---

*Servs.*, 109 P.3d 950, 956 (Alaska 2005) (holding that father's anger management counseling did not effectively demonstrate his ability to control his anger); *V.S.B. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 45 P.3d 1198, 1208 (Alaska 2002) (concluding that compliance with treatment plan is no guarantee that adequate parenting skills will be acquired).

remedy is determined on a case-by-case basis,[15] but "is likely to be shorter for young children" because "failure to bond with adult caregivers [while young] can result in lasting emotional damage."[16] Under the circumstances of this case, the court did not clearly err by finding that Terry failed to remedy his conduct within a reasonable time.[17]

The evidence at trial supports the superior court's findings that Terry's risk of relapse and reincarceration was real and that he had not yet developed the parenting skills necessary for his children to be safely returned to him. At the time of the termination trial, the children had been in OCS custody for essentially all of Audie's life and a significant portion of Ira's. Both children have significant special needs and have experienced harm as a result of Terry's behavior. And given Terry's history of substance abuse and the recency of his sobriety, it would likely take a substantial amount of time for him to prove he could be a safe parent. Further, as explained by a caseworker at trial, the agency was nowhere near being able to schedule a trial home visit with Terry. Therefore, we hold that the court's finding that Terry had failed to remedy his conduct was not clearly erroneous.[18]

---

[15] *See Trevor M. v. State, Dep't of Health and Soc. Servs., Off. of Child.'s Servs.*, 368 P.3d 607, 612 (Alaska 2016).

[16] *Christina J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 254 P.3d 1095, 1107 (Alaska 2011).

[17] A "reasonable time" is defined as "a period of time that serves the best interests of the child, taking in account the affected child's age, emotional and developmental needs, and ability to form and maintain lasting attachments." AS 47.10.990(30).

[18] In his reply brief, Terry argued that OCS has mischaracterized the court's findings, or alternatively, that "the disparity between the two parties' understanding of the court's order suggests the order is insufficiently clear to permit appellate review." We will not consider this argument, as it contradicts Terry's position in his opening brief, in which he stated that he "does not argue that the court's findings are so imprecise as to preclude appellate review." *See* Alaska R. App. P. 212(c)(3) (providing that reply brief "may raise no contentions not previously raised in either the appellant's or

**B.    The Superior Court Did Not Err By Finding That OCS Made Reasonable Efforts.**

A court may not terminate parental rights without a finding by clear and convincing evidence that OCS made "timely, reasonable efforts to provide family support services to the child and to the parents . . . that are designed to . . . enable the safe return of the child to the family home."[19]

Here, in making its determination that OCS provided reasonable efforts to prevent the breakup of Terry's family, the court considered OCS efforts that included the development of case plans, evaluations, and family contact plans, as well as referrals the agency made for mental health services, substance abuse treatment, and a neuropsychological evaluation. The court also referenced the fact that OCS had arranged in-person and videoconference visits with the children and bought plane tickets for Terry to attend in-person visits. The court noted that OCS also provided therapy and medical services for the children; it further found that Terry's completion of parenting classes was the fruit of the agency's efforts.

Terry acknowledged that OCS "created case plans and case evaluations, developed family contact plans and offered visitation, made referrals for substance abuse treatment, domestic violence, and parenting classes, offered transportation assistance, and provided services to the children." Nevertheless, he argues that OCS failed to make reasonable efforts. His argument is based solely on the claim that OCS did not make a timely referral for him to receive a neuropsychological evaluation.

Terry points out that by the time OCS referred him for a neuropsychological evaluation, "the case had been open for over two years and the petition to terminate his parental rights had been pending for nearly six months." He

---

appellee's briefs"); *Williams v. Baker*, 446 P.3d 336, 340 n.13 (Alaska 2019) (declining to reach issue not raised in appellant's opening brief).

[19]    AS 47.10.088(a)(3); AS 47.10.086(a).

argues that it was clear from the superior court's findings that Terry "may have needed services beyond the standard substance use treatment and parenting classes routinely offered parents" and that "a neuropsychological evaluation was warranted." The delay, he argues, "precluded a finding that the state made reasonable efforts."

At some point after December 2023, Terry told the caseworker that he suspected he might have Fetal Alcohol Syndrome and that he had been hospitalized for carbon monoxide poisoning. It was then that the caseworker recognized a pattern of self-defeating behavior and determined that Terry might benefit from a neuropsychological evaluation.

But prior to December 2023, it was not obvious to OCS that Terry would have benefited from a neuropsychological evaluation. For example, while Terry displayed a lack of judgment during the overnight unsupervised visits, the behavior did not necessarily call out for the need for a neuropsychological evaluation. And the caseworker's characterization of one of these mistakes as a "learning moment" was not unreasonable.

We have held that OCS's efforts "must be reasonable but need not be perfect."[20] And OCS has "some discretion in determining what efforts to pursue and whether the timing is reasonable."[21] Here, OCS reasonably focused its efforts on addressing Terry's substance abuse and parenting skills; it was not evident until late 2023 or early 2024 that a neuropsychological evaluation might be helpful. Given that OCS's efforts must be considered in their entirety over the life of a case,[22] the agency's

---

[20] *Casey K. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 311 P.3d 637, 645 (Alaska 2013) (quoting *Audrey H. v. State, Off. of Child.'s Servs.*, 188 P.3d 668, 678 (Alaska 2008)) (internal quotation marks omitted).

[21] *Id.* (quoting *Sean B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 251 P.3d 330, 338 (Alaska 2011)) (internal quotation marks omitted).

[22] *See Barbara P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 234 P.3d 1245, 1262 (Alaska 2010).

failure to make an earlier referral for an evaluation for Terry does not vitiate the reasonable efforts finding here.

Therefore, the superior court did not err in finding that OCS made reasonable and timely efforts.

## V.  CONCLUSION

The superior court's order terminating parental rights is AFFIRMED.