NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

DENISE L., )
                        )
           Appellant, )
                        )
       v. )
                        )
STATE OF ALASKA, )
DEPARTMENT OF HEALTH & )
SOCIAL SERVICES, OFFICE OF )
CHILDREN'S SERVICES, )
                        )
           Appellee. )
_____ )

Supreme Court No. S-15879

Superior Court Nos. 3AN-11-00110/ 00011/00012/00013 and 3AN-14-00005/ 00006 CN

MEMORANDUM OPINION AND JUDGMENT [*]

No. 1586 – May 25, 2016

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Paul E. Olson, Judge.

Appearances: Rachel Cella, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant. David T. Jones, Senior Assistant Attorney General, Anchorage, and Craig W. Richards, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Fabe, Maassen, and Bolger, Justices. [Winfree, Justice, not participating.]

## I.    INTRODUCTION

A mother appeals a trial court's decision to delay and consolidate a child in need of aid adjudication with a termination of parental rights trial. She also appeals the termination of her parental rights to one child. Because the superior court did not err

---

[*]    Entered under Alaska Appellate Rule 214.

in (1) delaying the adjudication and consolidating it with the termination trial, (2) declining to hear one of the children make a statement in camera, and (3) concluding that terminating the mother's parental rights was in the best interests of the child, we affirm the judgement of the superior court.

## II.	FACTS AND PROCEEDINGS

Denise L.[1] is 35 years old and a mother to seven children: Delilah, born in August 2000; Cora, born in March 2002; twins Abby and Alec, born in December 2004; Isis, born in February 2010; and twins Hank and Ari, born in December 2013. Her seven children have five different fathers. Denise does not have custody of any child. This appeal concerns Cora (14 years old) and twins Hank and Ari (2 years old).

### A.	Denise's History

Denise was removed from her parents' custody at a young age. She lived in three foster homes, then returned to her parents' home and was then removed again.

Denise's father was frequently absent from the home. He had a habit of constantly, physically touching Denise. At age three, Denise was sexually abused by her brother. Denise's mother, Selena L., physically abused her. When Denise was seven years old, Selena swung Denise by her feet and then let her go; the impact split her head open. Selena also hit Denise across the face with a belt and threw a fork at her that stuck in her forehead.

A child services case worker referred Denise to a hospital after she became "violently angry" and threatened to jump out of a window. While living at the shelter, Denise frequently said that she wanted to kill herself. During a psychological evaluation, Denise reported having hallucinations.

At age ten Denise was diagnosed with post-traumatic stress disorder,

---

[1]	Pseudonyms have been used to protect the privacy of the parties.

chronic oppositional defiant disorder, expressive interceptive language disorder, and parent/child problems. By age 14 she had twice attempted suicide. And by age 17 Denise had been in residential treatment in Alaska Children's Services for one year, detained at McLaughlin Youth Center twice, and hospitalized at Alaska Psychiatric Institute. After giving birth to her first two children, Denise was diagnosed with child neglect and personality disorder with dependent and passive-aggressive features.

During her most recent psychological evaluation, Denise said she thinks that OCS overstates Selena's problems and that her children should have a relationship with her because Selena is their only grandparent.

**B.      Office Of Children's Services Involvement**

In September 2000 the Office of Children's Services (OCS) began receiving reports that Denise was harming her children. The police told OCS that they observed unsanitary conditions in the house upon responding to a report that Selena and Denise were fighting in front of Delilah.

OCS received another police report about domestic violence involving Denise in October 2000. Denise had fought with her brother, who accused her of stabbing him with a fork; she was arrested for domestic violence assault.

OCS took Cora and Delilah into custody in August 2002 after receiving a police report of child neglect and unsafe living conditions at Denise's home. The police reported that a smell of urine and fecal matter pervaded Denise's home. Denise explained that it was difficult to keep up with cleaning because she was a single mother. OCS found that Denise and her children lived below minimal standards and removed the children from the home until later in the day, after Denise had made the home safe. Denise had regular visitations with her children while they were in foster care, and Denise agreed to move out of the home she shared with Selena. In November Denise secured her own apartment; in December OCS reduced its involvement to supervision.

In 2002 OCS requested a psychological evaluation of Denise through Dr. Michael Rose, who diagnosed Denise with post-traumatic stress disorder and personality disorder with dependent and passive-aggressive features.

In early 2003 Denise left the children with a new roommate, who acted as their nanny. The police arrested Denise's roommate for domestic violence that reportedly occurred in front of the children. Random people were also sleeping in the home, and Denise allowed Delilah to bathe without supervision. The home was very dirty.

OCS closed the case in February 2004 after Denise agreed to clean up her home and OCS saw improvements in her parenting. Denise completed her OCS case plan, and the CINA case was dismissed.

In 2006 Denise moved back in with her mother, Selena. Denise explained that she did not have anyone else to help her care for her children and that her father had just passed away. Her home was again filthy and unsafe. Investigations showed that her home was cluttered with laundry, food crumbs, and garbage on the floor. Carpeted portions of the home were heavily stained, and the parts that were not carpeted were littered with sharp objects. None of the children wore shoes at the time of the investigation. The home contained exposed stair railings, exposed hot water baseboard elements, and exposed wires from the refrigerator, the dryer, and the computer. Denise yelled at the children whenever she thought the investigator was not within hearing range. The children hit, bit, and stomped on each other.

In September 2006 OCS received a report that Cora arrived at school in dirty clothes; the school dressed Cora with a clean shirt but noticed that she wore it again the next day. The school reported that Cora had bad body odor from not bathing, that she had food in her hair, and that she wore shoes that were too small.

Around the same time, OCS received police reports that Delilah often

wandered unsupervised in the neighborhood, sometimes without shoes. She had wandered approximately one mile away from home without supervision on at least three occasions. Denise said Delilah often ran outside and did not follow Denise's instructions to come back. Delilah stated that Denise told her to get out of the house after Delilah complained that she was hungry. Denise's children all appeared unclean and regularly played outside without supervision; on several occasions, they were nearly hit by cars.

In November 2006 two-year-old Abby arrived at daycare with bruises and a finger that was totally black. Daycare staff reported sometimes finding Abby's clothes and buttocks covered in feces and that Abby was covered in bruises. Denise explained that Abby had fallen in the driveway. Denise also said that sometimes Alec bit Abby. The children were interviewed and examined at Alaska Cares. Abby and Alec had "old feces in their body creases," substantiating the reports that they were neglected.

In March 2007 OCS received another report that Denise was neglecting and abusing her children. Cora had found some pills of unknown type in the home and fed them to Abby and Alec, who then had to be taken to the emergency room.

OCS took Delilah, Cora, Abby, and Alec into its custody after OCS discovered that Selena was living in the home with the children, that the home had feces on the floor and exposed wiring, and that Abby and Alec were eating out of the garbage can. Denise agreed that she would not leave the children with her mother again.

In June 2007 OCS facilitated a team decision making meeting with Denise. The children were to leave foster care within the month, but Denise was first to demonstrate effective parenting during trial home visits. OCS continued to receive reports of neglect and abuse, and OCS discovered during one visit that Denise continued to use corporal punishment on Abby and Alec when they behaved in an aggressive manner. OCS held another team decision making meeting regarding Abby and Alec; the team decided that the twins would have trial home visits with their father. Denise also

participated in learning programs for infant and child care.

Multiple reports, including from Abby's and Alec's preschool, noted that the children had bruises and scratches. Alec had a long scratch that stretched from his forehead over his eye and down his cheek. Abby had long, deep scratches on the front of both thighs. When asked about the bruises and the scratches, the twins' father said that they received the marks while in daycare or while jumping on a couch. Abby had also come to school with markings on her neck consistent with pinching and said that her father made the marks. Abby's father said that her jacket zipper made the marks. Alec later had two long, one-inch wide scratches on his lower right back and neck and a large bruise on his right buttocks. But in March 2008 Denise and the twins' father completed their case plans and OCS released custody of the children to their parents.

The children were again interviewed in September 2008, and Abby claimed that her father sexually abused her. Denise was given temporary custody and assigned a custody investigator. The children accused Selena and Denise of abusing them.

In February 2009 Abby arrived at preschool with a black eye, which Denise claimed was from Abby running into another child while playing. In July 2009 OCS received two reports that Denise abused Abby. According to Abby, "[her] mama smacked [her] cause [she] ate in the car cause [she] was hungry," and two days later, "[her] mama hit [her] on the nose and made blood [come] out."

In October 2009 Alec reported to a social worker that Selena had hit Delilah and another sister on the head. Abby and Alec once left home with Cora without Selena's supervision, and Abby became lost. The police later found her and brought her home.

Abby and Alec were examined by Alaska Cares again in June 2010 for possible sexual abuse but did not disclose anything. In June 2010 Alec had sexual contact with Abby while they were under Selena's supervision. Cora (then eight years

old) witnessed the incident and told Selena about it.

In August 2010 the court warned Denise that she needed to protect her children from Selena. But Denise did not do so. The children reported more abuse in an interview with Alaska Cares in February 2011; the next month OCS received a report that Alec and Abby looked "dazed." OCS went to the home and found Selena in charge of the children while Denise was out of town. Selena had mixed up the children's medications or dosages. Denise appeared unconcerned when she learned this and said that she herself frequently mixed up pills. She continued to leave her children in their grandmother's care.

Reports repeatedly indicated that Selena not only abused Denise's children but was also unable to supervise them. Selena stated she usually watched the children for 16 hours weekly while Denise was gone and admitted to not being able to supervise the children effectively. Selena also admitted that she hit Alec with a broom when he did not listen to her. To address these concerns, OCS developed a safety plan in April 2011 that allowed Delilah, Cora, and Isis to continue living with Denise, but limited their contact with Selena; OCS placed Abby and Alec in a therapeutic foster home.

In July 2011 Abby had a brief trial home visit. At one point, Denise went into Fred Meyer, leaving Isis and Abby alone in the car. While Denise was in the store, a social worker called Denise's phone and Abby answered, revealing that she was alone in the car with Isis. Denise returned to the car and yelled at Abby to hang up.

In August 2011 OCS was notified that Abby was "spitting, kicking, cursing, and taking off her clothes" at school, and the school reported that she had several bruises on her body. Abby said her mother pinched her when they were in Kenai visiting their grandmother and told her not to tell anyone. Denise denied any role in these injuries. Abby's behavior became increasingly aggressive, including attempting to hit her foster mother. Abby was admitted into a hospital for treatment.

In October 2011 OCS met with Sue Meyer, Alec's therapist. Meyer was encouraged by Denise's engagement in therapy and reported being comfortable with Alec returning to his mother full-time. OCS held a team decision making meeting and decided to allow Alec to return for a trial visit.

In January 2012 Abby was discharged from the hospital and went back to live with Denise. Shortly after that, OCS received a report that Denise "had stabbed [Abby] in the hand with a screwdriver because she would not listen or move." Abby was readmitted to the hospital, but returned home a few days later with a revised safety plan. In July 2012, hospital staff recommended that both Abby and Alec be transferred to a residential treatment facility or therapeutic foster home, and by September 2012, both children had been enrolled in Texas NeuroRehab Center.

In February 2013, both Abby and Alec remained in treatment at Texas NeuroRehab. Abby was discharged in July for placement in a therapeutic foster home, but Alec remained at Texas Neuro Rehab for more than a year. In August 2013 Abby's foster parent reported to OCS that Abby had been hitting herself and threatening "to kill herself, to kill others, and to tell people the foster mother bit her"; she had also ripped her clothes off.

In September 2013 OCS learned that Denise was pregnant with twin boys. She continued to live with Selena. At the end of December Denise gave birth to Hank and Ari five weeks premature. Because the twins were premature, they required much more care than infants born at full term. The hospital staff was worried that Denise would not be able to provide the necessary care, and neither the staff nor Denise knew who the infants' father was. The hospital staff reported to OCS that Denise rarely took care of the infants and allowed Selena to feed and change them, despite encouragement by the hospital staff to do so herself.

In January 2014, three days after the twins' birth, OCS filed an emergency

petition to take Hank and Ari into custody and to place them in foster care because of Denise's neglect.

In summary, dating back to 2000 OCS received more than 60 reports of harm regarding Denise's family; the majority alleged neglect, physical abuse, and Denise's mental health issues. OCS stated that Denise's cases had spanned 12 years, longer than any other OCS case. She continued to expose her children to various men with whom she had short-term relationships, some of whom had felony convictions for drug offenses or assault. Cora and Delilah had been removed four times from their home and as a result developed anger, depression, and self-esteem issues. Denise had continued to place her children in her mother's care, notwithstanding that OCS had repeatedly told Denise that Selena was unsafe for the children. After OCS took custody of the children, Denise continued misleading them to believe they would return home, increasing the emotional harm to Cora and Delilah.

## C. Trial Proceedings

### 1. Proceedings to delay adjudication and to consolidate with termination trial

OCS took Hank and Ari into custody three days after their birth on January 3, 2014. OCS then filed an emergency petition alleging that the infant twins were children in need of aid. On January 8 the court found probable cause that the twins were children in need of aid. On March 4 Denise requested an adjudication hearing for the twins.[2] OCS requested a continuance for the adjudication until psychologist Dr. Melinda Glass finished her evaluation of Denise, which would determine OCS's recommendations for the case. Denise consented to postponing the trial-date-setting

---

[2] *See* AS 47.10.080(a) ("An adjudication hearing shall be completed within 120 days after a finding of probable cause is entered unless the court finds good cause to continue the hearing.").

conference for the adjudication to March 25.

On March 25 the court further postponed the trial-date-setting conference for the adjudication to April 22 upon OCS's request. OCS asked the court to find good cause for continuing the adjudication hearing outside the statutorily designated 120-day period pending OCS's plan to file a petition to terminate Denise's parental rights to her children.[3] Denise objected, pointing out that the 120-day limit meant that she was entitled to an adjudication by May 3, that the twins' case was separate from the proceedings to terminate her parental rights, and that OCS had not filed a petition to terminate her parental rights to any of her children. The court scheduled a hearing for April 22, again with Denise's consent to await the information expected from Dr. Glass's report.

On April 22 OCS submitted Dr. Glass's report and recommendations to the court. Denise wanted to cross-examine Dr. Glass and present additional evidence but was having trouble with the legal process without an attorney. She requested that the court re-appoint an attorney to assist her.[4] The court told Denise that the request would necessarily postpone the proceedings and constitute good cause under AS 47.10.080(a) to continue the adjudication. Denise consented to the continuance, and the court stated that it would appoint counsel for her. OCS repeated its request that the court consolidate the adjudication hearing for the infants with the termination trial but acknowledged that it had not yet filed a termination petition. The court set a status hearing to discuss scheduling the adjudication for June 17 because Denise's newly appointed lawyer would

---

[3]  *See id.* ("When determining whether to grant a continuance for good cause, the court shall take into consideration the age of the child and the potential adverse effect that the delay may have on the child.").

[4]  Denise had appointed counsel at the placement review hearing/disposition hearing and permanency hearing.

need time to prepare for the case.

At the June 17 hearing the court was prepared for an adjudication hearing for the infant twins, Hank and Ari, and a permanency and placement hearing for all of the children. However, Denise's attorney had met only once with Denise prior to the hearing and did not appear to be aware of any pre-existing concerns regarding the delay in the twins' adjudication hearing. Consequently Denise's attorney agreed with the court's good cause finding to postpone the adjudication for Hank and Ari and schedule another trial-date-setting conference in August. At this time OCS still had not filed a termination petition.

OCS filed a petition on August 5 to terminate Denise's parental rights to all of her children. OCS and Denise agreed to conduct the termination trial over four days in November. Neither Denise nor her attorney asked to separate the adjudication proceeding for Hank and Ari. But on August 12 Denise renewed her request for a separate adjudication hearing. OCS opposed the request and stated that it would move for a combined adjudication and termination trial. The court instructed Denise to file briefing on her request. Denise filed a motion on August 18 requesting a separate adjudication hearing, arguing that (1) the court lacked good cause to postpone the adjudication hearing any longer; (2) unnecessarily prolonging state intervention would harm the twins because they were young and needed to bond; (3) the court was not justified in delaying adjudication based on the possibility that Denise would not prevail at the adjudication stage; and (4) administrative convenience for consolidation was not good cause for delay.

OCS opposed Denise's motion, arguing that she consented to continuances at hearings on June 17 and August 5 and thereby waived her right to argue that the adjudication was untimely. OCS also argued that the court should deny Denise's motion because there was no reason to hold an adjudication hearing when the same evidence

would be presented a few weeks later at a termination trial. The court denied Denise's motion, agreeing with OCS that because the same evidence would be presented at the adjudication and the termination trial, a consolidated adjudication hearing and termination trial was warranted. The court found good cause to consolidate after "[c]onsidering the history of this case and the age of the children."

### 2. The court's denial of Cora's request to be interviewed in camera

During the termination trial in December 2014, Cora's attorney advised the court that Cora requested to speak to the court in chambers, stating that Cora "wants to be able to speak with [the judge]. She doesn't want to be put on the stand, she doesn't want to be cross examined. She doesn't want everybody staring at her. She wants an opportunity to speak to [the judge]."

The court denied Cora's request to be interviewed in chambers. The court reasoned that "[Cora] is 12 years old," and "[t]his is not a . . . custody proceeding" but "a termination proceeding." The court explained that in a termination proceeding the court is limited to inquiring whether terminating parental rights is in the best interests of the child. The court emphasized that this inquiry is different from whether it is in the best interests of the child to remain in the custody of a parent. The court concluded that interviewing Cora would be inappropriate in this context because Cora's interview "[would] not have anything to do with this case."

### 3. Termination proceedings and findings

As previously mentioned, OCS petitioned in August 2014 to terminate Denise's parental rights to Delilah, Cora, Abby, Alec, Ari, and Hank.[5] Trial took place over 11 days between November 6 and December 24. The court heard extensive

---

[5] During this action OCS did not seek to terminate Denise's parental rights to Isis because in December 2013 the superior court had awarded her father primary physical custody and sole legal custody.

testimony: OCS social workers outlined their involvement in Denise's case from 2000 to 2014; experts Dr. Melinda Glass, Dr. Michael Rose, and therapist Dan Bigley explained their evaluations of Denise's and the children's mental and emotional dispositions; other witnesses, such as mental health experts and hospital staff, testified to the conditions Denise had created for her children's lives.

The superior court issued its oral decision in January 2015 and then published its written order in March 2015. The court found by clear and convincing evidence that all six children were children in need of aid under AS 47.10.011(1) (abandonment), (6) (physical injury), (8) (mental injury), (9) (neglect), and (11) (mental illness). The court issued its written order on March 30, 2015.

The court found that Delilah, Cora, Abby, and Alec were children in need of aid because multiple instances of domestic violence were perpetrated against them or in front of them by both Denise and Selena. The court found that Denise clearly had "a mental illness, serious emotional disturbance, or mental deficiency of a nature and duration that places all of the children at substantial risk of physical or mental injury." After considering all of Denise's conduct — including her conduct prior to the termination proceedings — and the psychological evaluations conducted by Dr. Rose, Bigley, and Dr. Glass, the court found by clear and convincing evidence that Denise had failed to remedy these conditions:

> [Denise] suffered her own physical, mental, and emotional abuse at the hands of her mother. [Denise] herself was a child in need of aid and the evidence, including all of the psychological evaluations, indicates she has never recovered. Instead of facing her own issues, [Denise] has convinced herself that her mother is a proper support person when all of the history and all of the evidence in this case shows otherwise.

> By doing so, [Denise] has become what her mother was. She

has become emotionally, mentally, psychologically, and physically abusive and neglectful of her own children. [Denise] suffers from a mental illness and exhibits all of the characteristics of a borderline personality disorder. She has convinced herself that her mother is a safe person and she herself is a safe person, but all of her actions indicate otherwise.

The court found that "[Denise] appears to seek . . . completeness or fulfillment by bouncing from relationship to relationship in her belief that at some time in her life, she will eliminate her own feelings of abandonment or loneliness" and that "she appears to frantically seek out a man that will accept her, marry her, [and] take care of her and her children." But the court explained that Denise's relationships failed because "she has convinced herself that she has no issues, making it impossible for her to move forward." The court noted that she continued to enter into brief sexual relationships, bearing more children when she cannot take care of the ones she already has, and that she either does not know or refuses to identify who fathered some of her children. The court observed that Denise continued "to introduce new men to her children, identifying some as their psychological fathers, only to have the men disappear, passing on continuing feelings of abandonment to her own children."

The court found that Denise "ma[de] promises to the children [that] she c[ould] not keep," and manipulated them emotionally and psychologically to try to control them. In so doing, the court concluded that "[s]he destroy[ed] the[i]r opportunity to have a relationship[] with a normal parent." Because of her own mental illness and inability to take responsibility for her issues, the court found that "she is passing on to her own children a new generation of difficulties." The court noted that all of her children except Hank and Ari (who were removed by OCS when they were three days old and placed in foster care) were either in counseling or therapeutic treatment.

Based on testimony from care providers, OCS workers, and other witnesses,

-14- *1586*

the court found that under AS 47.10.088(b),[6] Denise had not remedied the conduct or conditions that placed her children at substantial risk of harm and that OCS had satisfied its duty to made reasonable efforts as required under AS 47.10.086.[7]  OCS had worked with Denise for 12 years, longer than any other case.  Despite OCS's efforts Denise had not changed her behavior or addressed her problems.  OCS's goal for many years had been reunification and home placement, but the court found Denise herself prevented reunification from occurring.

The court noted that OCS had proposed dialectical behavior therapy (DBT) in 2012, but Denise instead elected to do anger management therapy, which was apparently ineffective.  The court observed that evidence indicated that DBT does not work unless the participant has identified issues to work on; just going to the therapy would not lead to success.  The court found that Denise was not ready to take advantage of therapy because she could not identify and admit to her own issues, and it noted that DBT would take up to two years to complete, even if she were prepared.  The court commented that if anything, OCS had perhaps continued its efforts for too long.

When considering the best interests of the children to terminate Denise's parental rights under AS 47.10.088(b), the court emphasized that "all of the children have been harmed."  The court found it extremely unlikely that any child could be returned to Denise within a reasonable amount of time because she had not made progress in facing her dysfunctions and because it was extremely likely that the same

---

[6]     When making a determination whether termination of parental rights is in the best interests of the child, "the court may consider any fact relating to the best interests of the child" including the statutory factors.  AS 47.10.088(b).

[7]     "[T]he department shall make timely, reasonable efforts to provide family support services to the child and to the parents or guardian of the child that are designed to prevent out-of-home placement of the child or to enable the safe return of the child to the family home . . . ."  AS 41.10.086(a).

harmful conduct would continue. Denise had failed for 12 years to provide for her children's physical, mental, and emotional needs, and "the history of conduct and conditions created by [Denise] over this whole period of time confirms it."

The court noted: "[T]he children's best interest is paramount, not the parent's. A child's special needs and a parent's failure to address the needs is a consideration." The court found that the children suffered mental, physical, and psychological abuse in Denise's home. The court further found that with Denise's continuing mental illness, acting out, and failure to supervise and protect her children, any future custody with her would not be beneficial to the children.

The court found by a preponderance of evidence that it was in the best interests of all the children that Denise's parental rights be terminated, that it had been in their best interests for too long, and that too much damage had already occurred.

The court also found that the children had improved in their foster homes. Cora was doing well in her foster home, in her friendships, and in school activities; and Ari and Hank, having been removed from their mother three days after birth, were doing well and bonding with their foster parents. The court explained that all the children need permanency, stability, and opportunity to form their own safe, nurturing, and trusting relationships.

On March 20, 2015, the court entered its order permanently terminating Denise's parental rights to six of her children.[8]

Denise appeals, raising three arguments: (1) the superior court abused its discretion by delaying the adjudication hearing for Hank and Ari and combining it with the termination hearing; (2) the court violated Cora's right to due process and abused its

---

[8] As noted earlier, the court did not terminate Denise's parental rights to Isis, as her father had previously been awarded primary physical and sole legal custody.

discretion in declining Cora's request to be interviewed in chambers during the termination trial, and (3) the court erred in concluding that terminating Denise's parental rights was in Cora's best interests.

## III.   STANDARD OF REVIEW

We review a trial court's decision to continue an adjudication hearing and to consolidate it with the trial to terminate parental rights for abuse of discretion.[9]  An abuse of discretion occurs when the reasons for a decision are "clearly untenable and unreasonable."[10]  We review a finding of good cause for abuse of discretion.[11]  "In a CINA case, we review a superior court's findings of fact for clear error."[12]

Whether a court's denial to hear a child's statement in camera upon the child's request during proceedings to terminate parental rights violates due process is a question of law that we review "de novo, adopting the rule of law that is most persuasive

---

[9]      *See Moffitt v. Moffitt*, 341 P.3d 1102, 1104 (Alaska 2014) ("We review the denial of a motion to consolidate for abuse of discretion."); *Ben M. v. State*, *Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1018 (Alaska 2009) ("We review a denial of a motion to continue for abuse of discretion, determining whether a party has been deprived of a substantial right or seriously prejudiced by the lower court's ruling.").

[10]      *Payton S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 349 P.3d 162, 167-68 (Alaska 2015) (quoting *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 950 (Alaska 2000)).

[11]      *Vinson v. Hamilton*, 854 P.2d 733, 735 (Alaska 1993) (finding that "[a] grant or denial of a continuance shall be overturned only if the trial court abused its discretion" and that " good cause exists to grant a continuance when to do otherwise would hinder a party's ability to prepare her case in good faith."); *see also In re Adoption of Sara J.*, 123 P.3d 1017, 1021 (Alaska 2005) ("We review a finding of good cause to deviate from ICWA preferences for abuse of discretion.").

[12]      *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1111 (Alaska 2010).

in light of precedent, reason, and policy."[13]  A court's decision whether to allow a child to be interviewed in camera is reviewed for abuse of discretion.[14]

Whether the termination of parental rights is in a child's best interests is a factual finding that we review for clear error.[15]  Clear error exists if our "review of the entire record in the light most favorable to the party prevailing below leaves us with a definite and firm conviction that a mistake has been made."[16]  Ordinarily we will not overturn findings based on conflicting evidence but will look for evidence in the record to support the trial court's findings and conclusions.[17]  "[W]e will not reweigh evidence when the record provides clear support for a trial court's ruling.[18]

---

[13]   *D.M. v. State, Div. of Family & Youth Servs.*, 995 P.2d 205, 207 (Alaska 2000) (quoting *Guin v. Ha*, 591 P.2d 1281, 1284 n.6 (Alaska 1979)); *see also A.M. v. State*, 945 P.2d 296, 302 (Alaska 1997).

[14]   *Helen S.K. v. Samuel M.K.*, 288 P.3d 463, 474 (Alaska 2012).

[15]   *Sherry R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 332 P.3d 1268, 1273 (Alaska 2014).

[16]   *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 961-62 (Alaska 2013) (quoting *Brynna B. v. State, Dep't. of Health & Soc. Servs., Div. of Family & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004)); *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 269-70 (Alaska 2011).

[17]   *Emma D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 322 P.3d 842, 849 (Alaska 2014); *see also R.G. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 43 P.3d 145, 149 (Alaska 2002).

[18]   *Emma D.*, 322 P.3d at 849.

## IV. DISCUSSION

### A. The Court Did Not Abuse Its Discretion By Delaying The Adjudication Hearing For Hank And Ari And Combining It With The Termination Trial.

Denise argues that the superior court erroneously denied her request for a separate adjudication for Hank's and Ari's CINA statuses, requiring the reversal of its termination order. She contends that a separate adjudication hearing earlier in the case would have allowed her to explain her progress and would have clarified what problems she needed to address so that she could reunify with the twins. Instead, she argues that because of the delay, she had no recourse to challenge OCS's continuing involvement in her life and that this delay increased the likelihood that any progress she made would be offset by her children's developing bond with their foster parents. She further argues that in combining the two proceedings, the court deprived her of a meaningful opportunity to reunify with Hank and Ari.

#### 1. The court's finding of good cause to delay the adjudication hearing was not an abuse of discretion.

Alaska Statute 47.10.080(a) provides that an adjudication hearing to determine whether a child is in need of aid must conclude no later than 120 days after a finding of probable cause unless the court finds good cause to delay:

> An adjudication hearing shall be completed within 120 days after a finding of probable cause is entered *unless the court finds good cause to continue the hearing.* When determining whether to grant a continuance for good cause, the court shall take into consideration the age of the child and the potential adverse effect that the delay may have on the child. The court, at the conclusion of the hearing . . . shall find and enter a judgment that the child is or is not a child in need of aid.[19]

---

[19] AS 47.10.080(a) (emphasis added).

Here, the court found probable cause on January 8, 2014 that Hank and Ari were children in need of aid, thus the 120-day window ended on May 8. But the court found good cause to delay the hearing. When Denise requested adjudication for the twins on March 4, OCS requested a continuance pending the completion of Dr. Glass's psychological evaluation. Denise consented to the continuance.

On March 25 Denise objected to OCS's request that the court find good cause for continuing the adjudication hearing outside the 120-day period based on OCS's plan to file a termination petition. But Denise again consented to postponing a trial-date-setting conference for adjudication to await further information regarding Dr. Glass's report, which had not been finalized by the March 25 hearing.

On April 22 Denise requested the appointment of an attorney. The court found this request to be good cause for delaying adjudication, and again with Denise's consent, set the scheduling hearing for the adjudication for June 17, permitting her new counsel time to become familiar with the case.

On June 17 the court identified the need for an adjudication hearing but Denise's lawyer was unfamiliar with the issues. He consented to scheduling a new trial-date-setting conference and to the court's good cause finding to postpone the adjudication.

In August OCS petitioned to terminate Denise's parental rights. Denise and OCS agreed to conduct the termination trial in November. But Denise objected to consolidating the adjudication of Hank and Ari with the termination trial. OCS opposed.

The court found good cause to delay the adjudication and consolidate it with the termination trial because the same evidence would be presented at both proceedings. The court did not abuse its discretion in delaying the adjudication. And the termination trial occurred within a month of when the adjudication hearing would have been conducted after the court's last continuance. These facts amply support the

court's good cause decisions, and the court did not abuse its discretion in deciding to delay the adjudication.

        **2.**      **The court did not abuse its discretion in consolidating the adjudication hearing with the termination trial.**

Alaska Child in Need of Aid Rule 18(b) expressly makes joinder of the adjudication hearing and the termination trial a matter of discretion for the superior court,[20] and the rule states that "[u]pon a showing of good cause and with adequate notice to the parties, an adjudication hearing and a termination hearing may be consolidated." Furthermore, Alaska Civil Rule 42(a) grants similar authority to the superior court in more general terms for actions involving common questions of law or fact and guides the inquiry for a determination of good cause: "[The court] may order a joint hearing or trial of any or all the matters [at] issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay."[21]

We have previously found good cause for consolidating the adjudication and termination proceedings when (1) a significant amount of evidence presented in proceedings at trial is relevant to both adjudication and termination; (2) children had been in foster care for a long time before the filing of the petition for termination so that the evidence for termination proceedings was well developed prior to the CINA

---

    **20**    CINA Rule 18(b); *A.M. v. State*, 891 P.2d 815, 828 (Alaska 1995), *overruled in part on other grounds by In re S.A.*, 912 P.2d 1235 (Alaska 1996).

    **21**    *See Jeff A.C., Jr. v. State*, 117 P.3d 697, 709 & n.5 (Alaska 2005) (Bryner, C.J., concurring) (citing CINA Rule 18 and Alaska R. Civ. P. 42(a) to support court's discretionary decision to consolidate adjudication and termination proceedings).

adjudication; and (3) the parent received ample notice of OCS's claims.[22]

As OCS pointed out, and the superior court agreed, good cause to consolidate existed because a large amount of the evidence could be admitted at both proceedings.  And in its written order the court noted that the termination trial was scheduled to begin in a month.  Hank and Ari were taken from Denise's custody three days after their birth and the petition for termination was filed eight months later, but the body of evidence regarding termination with respect to all four children "was well developed [before] the CINA adjudication."[23]  And Denise received ample notice regarding OCS's claims because the termination petition was filed in August 2014, the court noted this at an August hearing, and the consolidated adjudication and termination proceedings began three months later in November.

> **3.** **Denise does not demonstrate that the continuance and consolidation deprived her of a substantial right or caused her serious prejudice.**

To establish that the superior court abused its discretion, Denise must also demonstrate that she has been "deprived of a substantial right or seriously prejudiced by the lower court's ruling.[24]  Denise has not done so.  She contends that the superior court deprived her of a meaningful opportunity to reunify with Hank and Ari by giving her no time to understand what OCS expected of her and to rectify her behavior.  But she had ample opportunity to understand her responsibilities as a parent and to demonstrate her ability to parent safely during the 12 years of OCS's involvement in her case.  During

---

[22]     *See A.M.*, 891 P.2d at 828 (finding these factors to support good cause for consolidation).

[23]     *Id.*

[24]     *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1018,1019 (Alaska 2009).

that time she failed repeatedly to make the behavioral changes necessary to safely parent her children. After Hank's and Ari's birth, she resisted their pediatrician's and therapist's recommendations and she left them under her mother's care, knowing that OCS on multiple occasions had instructed her that her children were unsafe in Selena's care.

And Denise failed to show that the result would have been different even if the court had held a separate adjudication hearing earlier. The court found that Denise neglected her other children.[25] A court may find that a child is in need of aid if another child in the same household has been subjected to neglect.[26] Thus the court certainly could have found Hank and Ari to be children in need of aid based on the finding that Denise neglected their older siblings.

Finally, even if Denise could show that the trial court abused its discretion in delaying and consolidating the adjudication hearing with the termination trial, she is not entitled to any relief because she has not challenged on appeal the findings that supported terminating her parental rights to Hank and Ari. Denise does not challenge the finding that Hank and Ari are children in need of aid or the finding that terminating her parental rights is in their best interests.

We conclude that the superior court did not abuse its discretion in continuing and consolidating the adjudication.

---

[25]     *Denise L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, No. S-14877, 2014 WL 1168868, at *3 (Alaska Mar. 19, 2014).

[26]     AS 47.10.011(9) ("[T]he court may find a child to be a child in need of aid if . . . conduct by or conditions created by the parent . . . have subjected the child or another child in the same household to neglect."); *see also Danielle A. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 215 P.3d 349, 355 (Alaska 2009) (holding that the court did not err in basing CINA adjudication on prior neglect).

B. **The Superior Court Did Not Clearly Err In Concluding That Terminating Denise's Parental Rights Was In Cora's Best Interests.**[27]

Denise argues that the superior court erroneously concluded that terminating Denise's parental rights was in Cora's best interests.[28] She argues that the trial court failed to consider Cora's individual circumstances and instead relied on evidence regarding the other children. Denise argues that because Cora has not been harmed and because OCS does not have a permanency plan for Cora, it was error to terminate Denise's parental rights to her.

"Before terminating parental rights, the superior court must find by a preponderance of the evidence that termination is in the child's best interests."[29] "In a termination trial the best interests of the child, not those of the parent[], are paramount."[30] A superior court may consider any fact relating to the best interests of the child in its best-interests analysis, including those factors set out in AS 47.10.088, and it "need not

---

[27] Denise does not appeal the superior court's best interests findings regarding Hank and Ari.

[28] During the termination trial, Cora's attorney advised the superior court that Cora wished to talk to the court in an in camera proceeding in chambers. The court denied this request, and Denise argues on appeal that the trial court was required to allow Cora to be interviewed in camera and that the court's ability to make best interest findings was "crippled" without hearing Cora's statement. Cora, who was represented by counsel in the trial court, did not appeal the court's denial of her request to be interviewed in chambers, and we therefore decline to reach this issue. To the extent Denise argues the absence of Cora's proposed in chambers statement renders the trial court's best interests findings infirm, we find no merit to this conclusion.

[29] *Chloe W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 336 P.3d 1258, 1270-71 (Alaska 2014) (citing CINA Rule 18(c)(3)).

[30] *Hannah B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 289 P.3d 924, 932 (Alaska 2012).

accord a particular weight to any given factor."[31] We have also previously concluded that termination of parental rights may be proper despite the child's "strong desire to return" to the parent and despite "the lack of a permanent placement" for the child.[32]

Based on the reports and supporting testimony, the trial court found that Denise's case was "particularly tragic," and exemplified a behavioral cycle where a mother who was herself subject to physical, emotional, and mental abuse by her mother, had adopted the same inability to parent and protect her own children. The trial court found by clear and convincing evidence that Denise and her mother caused substantial harm to all of the children, and that Denise's continuing mental illness, acting out, and failure to supervise and protect her children indicated that any future custody with her would not be beneficial to the children. The court also found that there was clear and convincing evidence that Denise had not remedied the conduct or conditions in her home that placed the children at substantial risk of harm, and that given the "abundant testimony from providers, OCS workers, and other witnesses," OCS had made reasonable efforts to assist Denise.

Contrary to Denise's position, the superior court distinguished Cora from Denise's other children in determining harm. The court found that Denise did not follow recommendations to avoid introducing new men to her children's lives. The court noted that Denise sometimes left visits with the children early in order to pick up her boyfriends's children and that she sometimes took Cora along to pick up Denise's boyfriend's children and spend time with them, thus acting against recommendations and exposing Cora to the men she dates. Because of continued uncertainty about her

---

[31] *Chloe W.*, 336 P.3d at 1271 (quoting AS 23.30.088(b) and citing *Hannah B.*, 289 P.3d at 932).

[32] *See William S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, Nos. S-14928/14930/14943, 2014 WL 199882, at *12 (Alaska Jan. 15, 2014).

placement after being removed from Denise's custody four times, Cora began to display anxiety, depression, and self-esteem issues. The court found that Denise had passed these issues on to her child, and that Cora is in therapeutic treatment as a result. The court specifically found that Cora and her siblings were children in need of aid because multiple instances of domestic violence were perpetrated against them or in front of them by Denise and Selena. And the court found that in contrast, Cora was doing well in her foster home and in school, where she was making friends and participating in social activities. Ample evidence supports the superior court's best interests findings regarding Cora.

In any event there is little need to distinguish the harm to Cora because Denise's harmful conduct and repeated failure to correct her behavior created conditions sufficient for finding harm to each of the children. As of June 2012 Denise's home was still unsanitary, littered with exposed dangerous items, bare wires, rotten food, trash, and had food on the wall. Cora was exposed to these living conditions since birth, and if Denise's parental rights to Cora were not terminated, Cora would continue returning to these conditions. This would not be in her best interests.

The superior court considered multiple factors in making its best interests determination and the record supports its findings. The superior court did not clearly err in finding it was in Cora's best interests for Denise's parental rights to be terminated.

V.    CONCLUSION

We AFFIRM the superior court's order terminating Denise's parental rights to Cora, Ari, and Hank.