NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JUSTIN D., | ) | |
| | ) | Supreme Court Nos. S-18335/18336 |
| Appellant, | ) | (Consolidated) |
| | ) | |
| v. | ) | Superior Court No. 3SW-16-00001 CN |
| | ) | |
| STATE OF ALASKA, DEPARTMENT | ) | MEMORANDUM OPINION |
| OF HEALTH & SOCIAL SERVICES, | ) | AND JUDGMENT* |
| OFFICE OF CHILDREN'S | ) | |
| SERVICES, | ) | No. 1963 – May 3, 2023 |
| | ) | |
| Appellee. | ) | |
| | ) | |
| CORA G., | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF ALASKA, DEPARTMENT | ) | |
| OF HEALTH & SOCIAL SERVICES, | ) | |
| OFFICE OF CHILDREN'S | ) | |
| SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Seward, Lance Joanis, Judge.

---

\*      Entered under Alaska Appellate Rule 214.

Appearances: Sharon Barr, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Appellant Justin D. Michael L. Horowitz, Law Office of Michael Horowitz, Kingsley, Michigan, for Appellant Cora G. Mary Ann Lundquist, Senior Assistant Attorney General, Fairbanks, and Treg R. Taylor, Attorney General, Juneau, for Appellee.

Before: Winfree, Chief Justice, Maassen, Carney, and Henderson, Justices. Carney, Justice, dissenting. [Borghesan, Justice, not participating.]

## I. INTRODUCTION

Parents appeal the termination of their parental rights to their now-teenaged son. The parents' rights were terminated once before, but we vacated that termination order and remanded for further proceedings in April 2020. Following remand, the Office of Children's Services (OCS) continued efforts to reunify the family but ultimately brought another termination petition. The superior court once again terminated the parents' rights in February 2022 based upon a finding of neglect.

The parents challenge the neglect finding, arguing that the superior court cannot aggregate evidence applicable to other subsections of the CINA (Child In Need of Aid) statute to find neglect. The mother also challenges the superior court's findings that she failed to remedy the conduct causing her son to be in need of aid and that OCS made reasonable efforts to reunify the family. We hold that the superior court's neglect finding is legally sufficient, and we see no error in the court's findings that the mother failed to remedy her conduct placing the child at risk and that OCS made reasonable efforts. We thus affirm the termination order.

**1963**

## II. FACTS AND PROCEEDINGS

### A. Events Before April 2020

Carlos[1] was first removed from his parents' care in April 2016. The superior court terminated Cora G.'s and Justin D.'s parental rights in September 2018. We vacated that termination order in April 2020.[2] For a comprehensive description of the family history and events, we refer the reader to that opinion, and only briefly summarize relevant facts here.

Cora and Justin had their son, Carlos, in September 2007 when they were living abroad.[3] Justin served in the military and the family moved frequently, but eventually, the family moved to Seward.[4] Carlos is a highly intelligent child with significant special needs.[5]

In April 2016 OCS removed Carlos from Cora's custody and a few months later, from Justin's, based on reports that Carlos had been sexually and physically abused by Cora and neglected by Justin.[6] The parents' and Carlos's subsequent disclosures further supported concerns that Cora had neglected Carlos by leaving him alone for extended periods; that both parents had failed to attend to Carlos's developmental needs; that the parents had engaged in domestic violence in Carlos's presence; and that Justin had assaulted Carlos.

---

[1] We use pseudonyms to protect the parties' privacy.

[2] *Cora G. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 461 P.3d 1265, 1289 (Alaska 2020).

[3] *Id.* at 1268.

[4] *Id.*

[5] *Id.*

[6] *Id.* at 1269-70.

Following removal, a clinical neuropsychologist diagnosed Carlos primarily with reactive attachment disorder, social communication disorder, and attention-deficit/hyperactivity disorder.[7] The neuropsychologist also concluded that his profile was consistent with autism spectrum disorder.[8] Based on OCS's reports and an examination of Carlos, the neuropsychologist found that there was "clear indication that he suffered significant trauma over the course of his early childhood when he was still under the care of his biological parents."

The parents' visitation with Carlos was limited based on therapeutic recommendations, as Carlos exhibited significant trauma responses to hearing about or from his parents.[9] The parents consistently requested visitation and the court held a visitation hearing in early 2018.[10] The court ultimately approved OCS's adherence to the therapists' recommendations against in-person and telephonic visitation, but ordered updates regarding the possibility of such visitation in the future. Justin and Cora were also encouraged to send Carlos letters or emails to facilitate a continued relationship.

At the first termination trial, the court found that the parents' conduct "resulted in mental injury to [Carlos], and it was substantial mental injury."[11] The superior court could not pinpoint the exact source of trauma, but found generally that Carlos was traumatized.[12] The superior court relied upon the testimony of Carlos's Anchorage therapist, who testified that she had diagnosed Carlos with several disorders

---

[7]    *Id.* at 1268-69.

[8]    *Id.*

[9]    *Id.* at 1271.

[10]   *Id.* at 1271-73.

[11]   *Id.* at 1275 (alteration in original).

[12]   *Id.*

based on the neuropsychologist's report.[13] The court issued a termination order in September 2018.

The parents appealed the superior court's termination order, and in April 2020 we vacated the order and remanded.[14] We held that OCS needed to offer qualified expert testimony to establish that the parents' conduct caused Carlos mental injury under the applicable subsection of the CINA statute, and that it had failed to do so during the termination trial.[15] We further noted that the superior court had failed to address whether Carlos's therapist was qualified to testify as an expert witness in the area of mental injury to children.[16]

## B. Events After Reinstatement of Parental Rights

In spring 2020 OCS continued to work with the family to provide support services. At this point Justin and Cora were reunited and living in Washington. Three separate caseworkers provided support services to the family during this time. The first caseworker was assigned to the case until mid-July 2020; the second from July 2020 to early October 2020; and the third caseworker was assigned in October 2020 and worked with the family through the second termination trial.

### 1. Summer 2020 through early 2021: parental rights reinstated and Carlos's move to Washington.

Following reinstatement of Justin's and Cora's parental rights, the first caseworker resumed efforts to provide services to Justin and Cora. He had some difficulty coordinating with Cora due to the need for an interpreter and her request to work through her attorney. Cora needed to sign a release to use an interpreter for the meetings, which she did not complete for at least one month after OCS sent it to her.

---

[13]    *Id.* at 1274.

[14]    *Id.* at 1289.

[15]    *Id.* at 1285, 1287-88.

[16]    *Id.* at 1287.

The first caseworker also re-established letter writing from Justin and Cora to Carlos through Carlos's therapist. When the second caseworker took over the case, she also worked to provide services to the parents, primarily focusing on parenting classes, initiating referrals for psychological assessments, and continuing to facilitate communication with Carlos through letters to be provided to him in a therapeutic setting.

In August 2020 OCS placed Carlos with his paternal uncle in Washington. Before leaving Alaska for Washington, Carlos was evaluated by a psychologist who also diagnosed Carlos with reactive attachment disorder "due to complex trauma with associated encopresis, enuresis, attention-deficit hyperactivity disorder." This assessment aligned with the earlier diagnosis of reactive attachment disorder. Carlos was enrolled in school and received therapy in Washington.

Carlos's behavioral issues initially improved in Washington but deteriorated significantly after his birthday in September. His uncle would later testify that Cora had hidden secret notes in birthday gifts she sent to Carlos. Cora had sent Carlos shirts with notes hidden in the collars, outside of therapeutically approved communication. After that Carlos could not sleep for several nights and began acting very aggressively towards the women and girls in his life, including his three-year-old cousin.

From August until October 2020, as Carlos was transitioning to new providers in Washington, there was a gap in his parents' letters reaching him through therapeutically approved means. Starting in November, the third caseworker sent Carlos's Washington therapist the letters from Cora and Justin, and the therapist testified he read them to Carlos at the direction of OCS. Carlos had severely adverse reactions to these letters, including soiling himself. He continued to have trouble talking at all about his past or his parents. Meanwhile, beginning in October 2020, Justin's and Cora's case plans required each to obtain a psychological parenting

assessment that would inform recommendations about how the parents could develop capacities to adequately parent Carlos.

Throughout that fall and winter, Carlos's negative behaviors escalated to the point that his uncle felt he could not continue to care for Carlos. The most severe of these incidents involved Carlos pushing his cousin off a trampoline and threatening to kill another child at school.

In February 2021, Carlos's uncle took him to a doctor in Washington who specialized in autism spectrum disorder, after his providers in Washington—like many of the earlier ones in Alaska—indicated that they thought Carlos was on the autism spectrum. Carlos was formally diagnosed with autism spectrum disorder and generalized anxiety disorder.

OCS recommended autism-specific parenting classes as a part of the parents' case plans. Neither parent was able to complete such a class during the remaining pendency of the case. Both parents tried to start an autism course: Justin testified he had attended two sessions, and Cora registered for a course beginning in September 2021.

In addition to forwarding letters, the third caseworker continued to try to provide services to the parents. Like previous caseworkers, she made repeated efforts to meet with Cora and Cora's attorney, along with an interpreter, but they were not able to have a formal case planning meeting until April 2021. This caseworker also continued to case plan with Justin, meeting with him in November 2020 and throughout the spring to get releases signed and make referrals to various providers.

**2. Spring and summer 2021: Carlos returned to Alaska and parents received evaluations.**

In May 2021 Carlos returned to Alaska and to his previous therapeutic foster home there. Carlos resumed therapy with his Anchorage therapist. That therapist did not recommend reunification, in part because Carlos said he did not want any contact with his parents.

Justin and Cora completed psychological parenting assessments in May and June 2021 respectively. The assessor found that each parent had a combination of personality disorders that significantly affected their abilities to function in various settings. But because the assessor was not able to observe their parent-child interaction, he was not able to make a definitive assessment of their parenting skills. He reported that the parents' personality disorders were typically persistent, and thus likely impacted how Justin and Cora treated Carlos when he was in their care. The assessor also found that Cora's cognitive deficiencies could seriously impact her ability to parent. In all, the assessor found that both Justin and Cora had mental health issues likely to significantly impact their parenting abilities. He made recommendations for both parents to engage in long-term counseling and other behavioral changes and parenting classes.

Both Justin and Cora worked on portions of their case plans throughout this time. Justin completed a parenting class and he started an autism course. He later testified that he intended to start individual therapy soon, but could only complete one element of his case plan at a time given the demands of his job. Cora also completed a parenting class. Both parents continued to write letters to Carlos, although Justin eventually stopped.

### 3. Second termination trial

OCS filed a new termination petition in January 2021. OCS argued that Carlos was a child in need of aid based on multiple subsections of AS 47.10.011: substantial physical harm (6); sexual abuse (7); mental injury (8); neglect (9); and parental mental health (11). In June 2021 OCS further alleged abandonment under subsection (1).

The termination trial was held over 10 days in August and September 2021. The three OCS caseworkers, Carlos's Washington and Anchorage therapists, and Carlos's uncle testified for OCS. Justin also testified. The superior court further considered the record and testimony from the first termination trial.

The caseworkers testified about their respective efforts toward the family as a whole and the parents' responses to those efforts. All three caseworkers testified about persistent attempts to work with the parents in spite of significant resistance and difficulties scheduling meetings with Cora and Justin and their attorneys. The third caseworker testified that the parents had engaged in some recommended activities, but had not been "implementing that knowledge" into their lives. She also testified that Cora and Justin had not fully acknowledged what brought Carlos into OCS's care in the first place.

Carlos's Anchorage therapist testified that it took a long time for Carlos to talk with her, but that he eventually disclosed significant traumatic incidents, including that Justin would "hit him" and that Cora touched him "down there" in ways that made him feel uncomfortable. These statements were admitted over a hearsay objection, for the purpose of describing medical history and the cause of medical symptoms. The therapist also testified that Carlos's behavioral difficulties could result from a combination of his autism and his experiencing prior traumas. Carlos's uncle and his Washington therapist also testified about Carlos's severe behavioral crises during his time in Washington.

Finally, Justin testified that he had a job as a truck driver and that it prevented him from doing more than one case plan activity at a time. He stated that he quit sending Carlos letters because he did not think they were being read or helping the reunification process. Justin also testified that he often felt undermined by OCS, but he wanted to work on a process where Carlos was ultimately returned to him.

### 4. The superior court's findings

The superior court made oral findings on the record in February 2022. The court considered evidence of various aspects of Carlos's life and found by clear and convincing evidence that Carlos was a child in need of aid due to neglect by his parents. In particular, the court found that through various aspects of their conduct, the parents failed to provide for the "care and control necessary for [Carlos's] physical and

mental health and development."[17]  The superior court focused on Carlos's significant behavioral issues, and reiterated numerous times that Carlos has "high needs" or "special needs."  The court also focused on Carlos's very negative reactions to hearing about his parents, getting letters from his parents, or discussion of the prospect of visitation.

The superior court further relied on the parents' conduct and their own past testimony to support findings of general physical neglect, some potential substance abuse, and domestic violence.  The court also placed great weight on the parents' psychological evaluations.  It considered those evaluations highly relevant to Cora's and Justin's abilities to adequately parent Carlos, given his special needs.  Considering all of these factors together, the superior court found that Carlos was a child in need of aid due to neglect.

The superior court also found by clear and convincing evidence that the parents had not remedied the conduct that made Carlos a child in need of aid and that OCS had made reasonable efforts to enable Carlos's safe return to the family home.  Finally, the superior court found that termination of the parents' rights was in Carlos's best interests, and the court terminated their parental rights.

## III.  STANDARD OF REVIEW

Whether a superior court's CINA findings satisfy the relevant statutory requirements is a question of law we review using our independent judgment.[18]  We review a superior court's factual CINA findings and failure to remedy findings for clear

---

[17]  AS 47.10.014 (establishing parameters for finding neglect in CINA cases).

[18]  *Audrey H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 188 P.3d 668, 672-73 (Alaska 2008) (citing *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004)).

error.[19]  "Whether OCS made reasonable efforts to reunify the family is a mixed question of law and fact."[20]  For mixed questions of law and fact, "we review factual questions under the clearly erroneous standard and legal questions using our independent judgment."[21]

"Findings are clearly erroneous if review of the entire record leaves us with 'a definite and firm conviction that a mistake has been made.' "[22]  "[C]onflicting evidence is generally insufficient to overturn the superior court."[23]  We "will not reweigh evidence when the record provides clear support for the superior court's ruling."[24]

## IV.  DISCUSSION

### A.  The Superior Court's Finding That Carlos Is A Child In Need Of Aid Due To Neglect Is Legally Sufficient And Not Clearly Erroneous.

The superior court found that Carlos was a child in need of aid because "conduct by or conditions created by the parent . . . have subjected the child . . . to neglect."[25]  A court can "find neglect of a child if the parent . . . fails to provide the child with adequate food, clothing, shelter, education, medical attention, or other care

---

[19]    *Id.* at 672; *Charles S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 442 P.3d 780, 788 (Alaska 2019).

[20]    *Joy B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 382 P.3d 1154, 1162 (Alaska 2016) (quoting *Sherry R. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 332 P.3d 1268, 1273-74 (Alaska 2014)).

[21]    *Id.* (quoting *Sherry R.*, 332 P.3d at 1274).

[22]    *Charles S.*, 442 P.3d at 788 (quoting *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 290 P.3d 421, 427-28 (Alaska 2012)).

[23]    *Id.* (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1263, 1267 (Alaska 2008)).

[24]    *Id.* (quoting *Maisy W.*, 175 P.3d at 1267).

[25]    AS 47.10.011(9).

and control necessary for the child's physical and mental health and development."[26] Poverty alone cannot support a finding of neglect.[27]

Cora and Justin contest the superior court's neglect finding on three grounds: first, that the superior court erred in its legal analysis by aggregating evidence probative of other factors in making its neglect finding; second, that the superior court did not adequately state a neglect finding; and third, that there was insufficient evidence before the court to find that Carlos was a child in need of aid due to neglect. OCS responds that the neglect finding was both legally sufficient and not clearly erroneous, and in the alternative, that the superior court made several alternate, independent, and uncontested CINA findings. Here, we conclude that the court could permissibly rely on evidence related to other CINA subsections in making its neglect finding. We also conclude that the superior court adequately stated findings of neglect that are supported by evidence in the record.

### 1. A superior court can consider evidence probative of other subsections when making a finding of neglect.

Both parents argue that the superior court cannot aggregate evidence probative of other CINA findings to make a finding of neglect. Justin points out that there must be a causal link between that evidence pertinent to other subsections and the neglect. Cora similarly argues that combining conduct related to other subsections does not "arithmetically conjure" clear and convincing evidence of neglect. While noting the importance of making findings specific to the statutory categories, we recognize

---

[26] AS 47.10.014.

[27] AS 47.10.019.

that it is permissible for a superior court to consider evidence probative of one subsection in determining that a child is in need of aid under another subsection.[28]

This approach is consistent with our precedents. Indeed, in this case the superior court structured its analysis based on our decision in *Audrey H.*[29] The superior court in *Audrey H.* found that the children were in need of aid due to neglect because of the mother's "constellation of cognitive and emotional problems," the children's exposure to probable alcohol and substance abuse at home, and the mother's general incapability of caring for her children.[30] The superior court found that as a result of this neglect, both children suffered from serious mental illness and profound emotional damage, requiring admission to North Star Hospital for psychiatric treatment.[31]

In *Audrey H.* the mother argued on appeal that her mental illness and drug use were "irrelevant" to a finding of neglect.[32] We disagreed, reasoning that the mother's mental illness and drug use were relevant because they helped explain how and why she ultimately neglected her daughters.[33] We noted that there was no law prohibiting a court from considering evidence probative of one subsection in considering whether a child is in need of aid under another subsection.[34]

On numerous other occasions we have affirmed neglect findings when superior courts have relied upon evidence also relevant to other subsections of the CINA

---

[28] *See Audrey H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 188 P.3d 668, 675 (Alaska 2008).

[29] *Id.*

[30] *Id.* at 673-74.

[31] *Id.* at 674-75.

[32] *Id.* at 675.

[33] *Id.* at 674-75.

[34] *Id.* at 675.

statute. In *Neal M. v. State, Department of Health & Social Services, Office of Children's Services* we reiterated that a superior court may consider a child's exposure to drug use or other harmful activities in the home when making a neglect finding.[35] In *Annette H. v. State, Department of Health & Social Services, Office of Children's Services* we affirmed the superior court's finding of neglect based on the child's exposure to drugs in the home despite little evidence regarding the parents' pattern of drug use or substance abuse problems.[36] We have also upheld a neglect finding when a parent's substance abuse was particularly harmful to children whose mental health required significant consistency and stability.[37]

These precedents reflect the importance of considering a child's life as a whole, as well as the practical reality that children's needs and parents' conduct often cannot be neatly and exclusively compartmentalized. When considering a finding of neglect and whether a parent is able to provide adequate care and control, a court may consider the circumstances that may impact the parent's ability to provide care. There are usually specific reasons that a parent might neglect a child, and a court is well within its discretion to explore those reasons to support its ultimate neglect finding.

The superior court is still bound by the relevant statutory definitions in making its findings. While evidence probative of other sections may provide a causal explanation, there must also be evidence of the elements of neglect, such as insufficient "food, clothing, shelter, education, medical attention, or other care and control."[38] For example, in *Audrey H.* there was substantial evidence before the superior court

---

[35] 214 P.3d 284, 291 (Alaska 2009).

[36] 450 P.3d 259, 266 (Alaska 2019).

[37] *A.J. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 62 P.3d 609, 614 (Alaska 2003).

[38] AS 47.10.014.

14 **1963**

regarding the unsafe condition of the home and the older child's assumption of substantial care-giving for the younger child.[39]  Similarly, in *A.J.* the children were consistently late or absent from school, left for hours after school before being picked up, "dirty and hungry", and left to fend for themselves due to the mother's substance abuse.[40]  Additionally, the superior court must find harm to the child's health and development.[41]  The harm may be purely physical, such as a child's positive hair follicle drug test,[42] but it may also be harm specific to the child's mental health and development.[43]

In sum, the superior court's consideration of facts probative of other CINA subsections when it found Carlos to be a child in need of aid due to neglect was not, in itself, legal error.

**2.     The superior court made legally sufficient neglect findings.**

The closer question is whether the superior court made legally sufficient neglect findings.  Examining the court's lengthy oral findings as a whole, we conclude that the court made legally sufficient findings that Cora and Justin failed to provide the

---

[39]     *Audrey H.*, 188 P.3d at 674-75.

[40]     *A.J.*, 62 P.3d at 614 (finding children consistently absent or late to school, left for hours after school before being picked up, often "dirty and hungry," and often left to take care of themselves due to mother's substance abuse).

[41]     AS 47.10.014.

[42]     *See Annette H. v. State, Dep't of Health & Soc. Servs., Off. of Child's Servs.*, 450 P.3d 259, 266 (Alaska 2019) (finding child's positive drug test indicative of physical harm from neglect because parents allowed child to be exposed to drugs in the home).

[43]     *Audrey H.*, 188 P.3d at 674; *Neal M. v. State, Dep't of Health & Soc. Servs., Off. of Child's Servs.*, 214 P.3d 284, 291-92 (Alaska 2009) (finding educational and mental neglect because children missed almost eighty school days and had delayed verbal development).

"care and control necessary for [Carlos's] physical and mental health and development." The court's neglect finding is appropriately based upon a combination of the physical conditions in the parents' home prior to Carlos's removal, their history of domestic violence, and their underlying mental health issues, in light of Carlos's significant special needs and demonstrated trauma.

First, the superior court found several facts typical of neglect. Evidence in the record demonstrated that, prior to removal, Cora would leave Carlos alone without a caretaker for significant periods of time, and Justin asserted that Cora bottle-fed Carlos until his teeth were rotting. The superior court was also concerned that Carlos was in diapers long past a developmentally appropriate age.[44]

Cora argues this evidence is irrelevant now. She contends that Carlos is obviously no longer bottle-fed and that she has since improved her housing. However, those changes in condition are probative of whether Cora has remedied the conditions that placed Carlos in need of aid, not of whether Carlos suffered neglect.

In addition to facts typical of neglect, we have interpreted "other care and control necessary for the child's physical and mental health" to include situations when a parent's behavior harms a child's mental health and development despite the child having adequate food, clothing, and shelter.[45] Justin and Cora's behaviors created an environment totally lacking in the care and control necessary for Carlos's physical and mental health and development, particularly given his distinct challenges and needs.

---

[44] Carlos was eight and a half years old when he was removed. According to Cora, Carlos was in diapers because the family lived in a dry cabin without an outhouse. We emphasize, as Justin correctly notes, that the mere fact of poverty or living in a dry cabin cannot be the basis for a finding of neglect. AS 47.10.014. The issue here is distinct, though, in its focus upon Justin's and Cora's failure to adequately attend to Carlos's developmental needs.

[45] *See Audrey H.*, 188 P.3d at 673-75 (finding neglect due to severe harm to children's mental health).

An important consideration in evaluating the parents' actions in this case is Carlos's special educational and developmental needs. The superior court noted that "[Carlos's] special needs caused the level of minimally adequate parenting to increase," relying on Carlos's August 2020 neuropsychological evaluation. The neuropsychologist recommended that Carlos "be provided sensitive emotionally available caregivers with a psychological investment in him with basic building blocks of caregiver attunement and sensitivity."

The evidence demonstrates that rather than providing adequate care and control for Carlos, Cora and Justin both contributed to a home life that was utterly chaotic for their son. The superior court made findings about domestic violence and abuse in the home. For example, Justin hit Carlos and once stabbed him with a knife; Justin would repeatedly scream at Carlos; Cora and Justin would regularly fight loudly and keep Carlos from sleeping; Cora called Carlos names; and the parents each claimed that the other perpetrated regular acts of domestic violence in the home. The superior court implied that these violent disruptions would cause especially great harm to a child with Carlos's special needs.

Further, the superior court made findings about both parents' mental health in relation to their ability to parent. Evidence demonstrated that both parents have been diagnosed with persistent personality disorders that likely impacted their ability to parent Carlos when he was in their custody. The superior court emphasized that Justin and Cora are "very much . . . emotionally dysregulated and unavailable caregivers," who are not able to provide the environment and care that Carlos needs.

The superior court further found that the living conditions created by Justin and Cora harmed Carlos. Multiple witnesses testified regarding Carlos's ongoing struggle with past trauma and continued inability to speak about the past. Carlos's uncle testified that on two occasions, Carlos "broke down and started crying" after saying that his mother had "done something to him," and he would then be quiet and unresponsive for hours afterwards. Carlos's Anchorage therapist testified that she worked to help

him process and recover from trauma that she believed resulted from conditions in the home.

Multiple witnesses testified that Carlos has a significant trauma reaction to hearing about his parents and that he becomes non-responsive afterward. Indeed, Carlos's Washington therapist explained that Carlos would have extremely negative reactions, including soiling himself, when the therapist read Carlos letters from both Cora and Justin. The superior court cited Carlos's particularly extreme reaction to finding notes from Cora in his birthday gifts in Washington as strong support for the finding that Carlos would be further harmed if returned to his parents. The court found Carlos's level of dysregulation after receiving Cora's notes "astonishing." This finding was also based on testimony from some of Carlos's earlier therapists, who testified at the first trial they thought him to be traumatized.

Cora argues that that most of this evidence is not relevant to neglect. She also argues that just listing these facts as a "patchwork composite" does not constitute a legally sufficient neglect finding. We agree that, in places, the superior court could have made more explicit connections between Cora's and Justin's actions, Carlos's special needs, and the harm to Carlos. But our precedents support the superior court's ability to look at the whole picture of a child's life in determining neglect.[46] Examining the superior court's findings as a whole, the court sufficiently connected its findings related to various forms of conduct by the parents, Carlos's needs, and harm the parents caused Carlos to support its overall finding of neglect.

### 3. The superior court's findings are supported by evidence in the record.

Both parents argue that there was insufficient evidence to find that Carlos was a child in need of aid due to neglect. Justin primarily challenges the weight that the superior court gave to particular testimony and its credibility determinations. He

---

[46] *Id.* at 675.

also contends that there are alternative explanations for many of Carlos's behavioral problems, and that those problems are not a result of parental neglect. We are not persuaded by these arguments. We will not reweigh evidence when the record provides clear support for the superior court's ruling.[47] Viewing the record as a whole, we conclude that the superior court's findings are supported by evidence and are not clearly erroneous.

The superior court made extensive factual findings about Carlos's life with his parents and their actions amounting to failure to provide him with the "care and control necessary for the child's physical and mental health and development."[48] Justin correctly notes that the superior court erred when it found that he has never completed a substance abuse assessment; the record shows he did complete an assessment. But beyond that mistake, the record supports the superior court's findings. For example, Justin argues that Cora's testimony regarding the domestic violence that he inflicted upon her and upon Carlos is not credible or consistent. But it is the superior court that is in the best position to assess the credibility of witness testimony.[49] Moreover, Cora's testimony about the violence that she and Carlos endured is supported by the testimony of treatment providers regarding Carlos's reports of domestic violence in the home.

Justin also challenges the weight given to various pieces of evidence. For instance, Justin suggests that the court should have given less weight to his psychological parenting assessment because the evaluator was unable to observe any parent-child interaction. But the superior court expressly recognized this limitation in

---

[47] *Sherry R. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 332 P.3d 1268, 1273 (Alaska 2014).

[48] AS 47.10.014.

[49] *Jordan v. Jordan*, 480 P.3d 626, 633 (Alaska 2021).

considering both parents' assessments. The court found that even though a "definitive assessment" including such observation was not possible, the evaluation was still useful and entitled to weight in considering whether the parents' mental health issues harmed Carlos and whether Justin and Cora were capable of meeting Carlos's needs. We see no error in the court's consideration of the assessment and decline Justin's invitation to re-weigh the evidence.[50]

Justin also suggests alternative interpretations of evidence in the record. He contends that Carlos's behavioral and mental health challenges are primarily attributable to the trauma of being in the foster care system and his previously untreated autism, rather than lingering effects of any neglect. While it is true that multiple factors have likely contributed to Carlos's extreme stress and trauma, the record supports the superior court's interpretation of the evidence and its findings that the parents' conduct harmed Carlos and caused him significant trauma.

Carlos's behavioral and social problems are complex. And Justin highlights pieces of evidence that may be interpreted differently, particularly when considered individually. But conflicting interpretations are not enough for us to overturn a superior court's findings when they are supported by the evidence.[51] Considering the extensive record in this case, we see no clear error in the court's finding that the parents' conduct amounted to a failure to provide for the care and control necessary to Carlos's physical and mental health and development, resulting in ongoing harm to Carlos. We therefore affirm the superior court's finding that Carlos was in need of aid due to neglect.[52]

---

[50]     *See Sherry R.*, 332 P.3d at 1273.

[51]     *Id.*

[52]     Because we conclude the superior court did not err in finding that Carlos was a child in need of aid because of his parents' neglect, we need not address other

**B.** **The Superior Court Did Not Clearly Err By Finding That Cora Failed To Remedy The Conditions That Made Carlos A Child In Need Of Aid.**

Cora contests the superior court's failure to remedy finding, arguing that she completed her case plan and that additional parenting classes are not necessary to remedy neglect. Cora also points to evidence that she had enrolled in an autism-specific parenting class prior to the court's termination order. We conclude that despite Cora's completion of many elements of her case plan, the superior court's finding that Cora failed to remedy her conduct is not clearly erroneous.

To terminate a parent's rights, the superior court must find by clear and convincing evidence that the parent has not remedied the conduct that made the child in need of aid.[53] In general, "the superior court must consider 'whether [the parent] ha[s] remedied the problems that placed her children at risk and gained the necessary skills so that the children could be safely returned to her care.' "[54] Completing elements of a case plan, however, "does not guarantee a finding that a parent remedied her conduct."[55] A parent must show that she has implemented the knowledge promoted by the case plan elements into her life and actually changed her behavior.[56]

---

CINA findings that OCS argues are implicit in the court's termination order. *Annette H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 450 P.3d 259, 266 (Alaska 2019); *see also Borchgrevink v. Borchgrevink*, 941 P.2d 132, 139 (Alaska 1997) (stating that findings must be sufficiently clear to aid appellate review and provide notice to the parties).

[53] AS 47.10.088(a)(2).

[54] *Charles S. v. Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 442 P.3d 780, 792 (Alaska 2019) (alteration in original) (quoting *Barbara P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs*., 234 P.3d 1245, 1260 (Alaska 2010)).

[55] *Id.*

[56] *See Barbara P*., 234 P.3d at 1260.

The record in this case demonstrates that Cora has not implemented knowledge gained through working her case plan. In particular, the record illustrates no change or improvement in Cora's ability to see and understand Carlos's needs, especially his extensive special needs.[57] The superior court found that Cora does not have "the basic building blocks of caregiver attunement and sensitivity," despite completing several case plan requirements, including a parenting class.

The family's third caseworker testified that Cora still did not understand Carlos's needs and had not yet implemented skills that would allow her to appropriately parent Carlos. The caseworker also noted that Cora still does not "acknowledge what brought [Carlos] into OCS custody," impeding her ability to learn appropriate parenting skills. The testimony and report from the assessment regarding Cora's parenting skills further demonstrate that she still must make significant progress in addressing her mental health and parenting challenges to successfully parent Carlos. Most recently, Cora demonstrated her stark lack of understanding of, and inability to prioritize, Carlos's needs when she hid notes in Carlos's birthday gifts when he was in Washington.

Related to Cora's failure to remedy the conduct placing Carlos at risk of harm, the superior court also found that Cora had not yet begun an autism-specific parenting course as of the time of the termination trial. Cora contests this finding as clearly erroneous, as "trial testimony showed that she had indeed engaged in that class by the time of trial." The record generally supports Cora's position. The OCS caseworker acknowledged during her trial testimony that Cora's attorney had recently provided an update that Cora had become engaged in an autism-specific parenting class. However, the inaccuracy of this finding does not render clearly erroneous the superior court's overall finding that Cora had not remedied her behavior. The court's primary

---

[57]     *See id.*

conclusion was that Cora had failed to internalize and implement necessary behavioral changes. The fact that she had signed up for a specific class does not, by itself, call that conclusion into question.

We commend Cora's efforts to engage with her case plan. But given the evidence of her ongoing behavior and challenges, the record supports the superior court's finding that Cora remains unable to understand and prioritize Carlos's needs. We conclude the superior court did not clearly err by finding that Cora failed to remedy the conduct and conditions that made Carlos a child in need of aid.

**C.**    **The Superior Court Did Not Err In Finding That OCS Made Reasonable Efforts To Reunite Cora And Carlos.**

Cora argues on appeal that the denial of her ability to have in-person or telephonic visitation with Carlos was a de facto termination of her rights, which precluded a finding that reasonable efforts had been made. Given the record before us, we conclude that the denial of visitation in this case does not undermine the court's overall finding that OCS made reasonable efforts to reunify the family.

Generally, when "reviewing whether OCS made reasonable efforts, a court considers OCS's reunification efforts in their entirety," in light of all surrounding circumstances.[58] The primary consideration in determining what efforts are reasonable is the child's best interests.[59] OCS's efforts must be reasonable; they do not need to be perfect.[60]

---

[58]    *Id.* at 1262 (citing *Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 77 P.3d 715, 720 (Alaska 2003)).

[59]    AS 47.10.086(f).

[60]    *Burke P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 162 P.3d 1239, 1247 (Alaska 2007) ("We acknowledge that OCS's reunification efforts in this case were far from perfect. In the specific context of this case, however, we conclude that despite OCS's deficiencies its efforts at reunification were reasonable." (internal citation omitted)).

As a legal matter, denial of in-person or telephonic visitation does not automatically preclude a finding that reasonable efforts have been made.[61] Rather, OCS's effort to facilitate visitation is one of many factors that a superior court considers when evaluating the reasonableness of OCS's efforts.[62] While we emphasize the importance of visitation for reunification efforts, the form of visitation is ultimately determined in accord with the best interests of the child.[63] Visitation can be denied "if there is clear and convincing evidence that visits are not in the child's best interests."[64] A parent denied visitation is entitled to notice from OCS regarding the reasons for the denial and can petition for a review hearing.[65]

Here, the superior court addressed visitation at multiple hearings before the first termination trial. While the superior court found multiple times that it was in Carlos's best interests not to allow in-person visitation, the court also ordered OCS to continue to examine whether visitation would be appropriate in the future. Cora petitioned for and was granted a visitation hearing in 2018. At that hearing, the court determined, based on multiple therapists' recommendations, that ordering in-person visitation would be contrary to Carlos's best interests. The superior court recognized the severity of the restriction, however, and ordered monthly updates from OCS to ensure that visitation would occur if Carlos was able to tolerate it.

---

[61] *See, e.g.*, *Barbara P.*, 234 P.3d at 1262; *Doug Y. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 243 P.3d 217, 229 (Alaska 2010).

[62] *See, e.g.*, *Doug Y.*, 243 P.3d at 227-30 (noting that visitation is one factor that courts can consider when evaluating reasonable effort). OCS is statutorily required to provide reasonable visitation between the child and the child's parents when a child is in OCS's legal custody. AS 47.10.080(p), .084(c).

[63] AS 47.10.080(p), .086(f).

[64] AS 47.10.080(p).

[65] *Id.*; CINA Rule 19.1(a).

After removal Carlos consistently responded negatively to the prospect of in-person visitation. Multiple therapists advised that in-person visitation would harm his therapeutic progress. After remand Carlos continued to have severely adverse reactions to talking about his parents, receiving unexpected notes from his mother, and having letters from his parents read in therapy. This evidence supports past decisions against in-person visitation.

The superior court found by clear and convincing evidence that OCS's efforts with regard to the whole family were reasonable. The court cited the psychological and counseling services OCS facilitated for the whole family, including referrals to psychological assessments and parenting classes for the parents, as well as behavioral health care and "wraparound services" for Carlos. The superior court also noted OCS's efforts to reach the parents when they were out of state, through "text, email, Zoom or phone" and its provision of required interpreter services for Cora. Finally, the court noted that OCS continued to facilitate contact through sending letters from the parents to Carlos's therapists. The court's determination that these efforts were reasonable under the circumstances is consistent with our precedents.[66]

Overall, the superior court did not err in finding reasonable efforts had been made despite Cora's lack of in-person visitation. Visitation was thoroughly considered and litigated throughout the case, and was repeatedly determined to be

---

[66] *See, e.g.*, *Barbara P.*, 234 P.3d at, 1262-63 (affirming OCS had made reasonable efforts despite no visitation and listing other services that represented reasonable efforts, including referrals for classes and mental health counseling); *Doug Y.*, 243 P.3d at 227-29 (affirming OCS had made reasonable efforts despite no visitation and describing significant efforts to provide mental health and parenting assessments); *Burke P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 162 P.3d 1239, 1245-47 (Alaska 2007) (concluding referrals to counseling services, couples counseling and individual therapy were sufficient to support finding of reasonable efforts); *Moira M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 370 P.3d 595, 602-03 (Alaska 2016) (noting mother's unreliable communication did not preclude finding of reasonable efforts).

contrary to Carlos's best interests. OCS's otherwise reasonable efforts were not undermined by the restriction on visitation. We therefore affirm the superior court's finding that OCS made reasonable efforts.

## V. CONCLUSION

We AFFIRM the superior court's order terminating Cora's and Justin's parental rights.

CARNEY, Justice, dissenting.

I agree that the superior court did not err by finding that Cora failed to remedy the conditions that caused Carlos to be in need of aid and that OCS made reasonable efforts to reunite them. I also agree that it is "permissible for a superior court to consider evidence probative of one subsection in determining that a child is in need of aid under another subsection."[1] But I disagree that the evidence in this case supports a finding of neglect. For that reason, I respectfully dissent from today's decision.

We have long recognized that a superior court may, as the court says today, "aggregate" evidence relating to other subsections of AS 47.10.011 when considering whether a child has been subjected to neglect.[2] We have acknowledged that evidence which is not sufficient to prove that the child was subjected to the other condition may nonetheless support a finding of neglect.[3]

Alaska law defines neglect as a parent's "fail[ure] to provide . . . adequate food, clothing, shelter, education, medical attention, or other care and control necessary for the child's . . . development."[4] The law focuses on the parent's failure to act — a fundamentally passive requirement. This statutory definition is similar to the common understanding of neglect. Merriam-Webster defines neglect as "to give little or no attention or respect to[;] consider or deal with as if of little or no importance[;] disregard, slight" or "to carelessly omit doing altogether[;] leave undone or unattended

---

[1] Opinion at 13.

[2] *See, e.g., A.J. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 62 P.3d 609, 614 (Alaska 2003).

[3] *See, e.g., Annette H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 450 P.3d 259, 266 (Alaska 2019).

[4] AS 47.10.014.

to through carelessness or by intention."**[5]**  Other dictionaries agree; according to the American Heritage Dictionary, neglect means "[t]o pay little or no attention to; fail to heed; disregard"; "[t]o fail to care for or attend to properly"; or "[t]o fail to do or carry out, as through carelessness or oversight."**[6]**

All these definitions make clear that neglect is fundamentally passive — it is the failure to act in a way that is needed and expected, often due to carelessness or disregard of the obligation to do something.  And some of the superior court's findings are based upon behavior by Cora and Justin that fits this description:  their failure to recognize that bottle feeding and diapers were no longer appropriate for their son; Cora leaving Carlos "all by himself" for at least 45 minutes; and Justin's absences and failure to intervene to stop what he recognized was Cora's potential neglect of Carlos.

But the superior court also considered evidence of very different parental behavior.**[7]**  Today's decision cites these examples in support of affirming the superior court's decision:  Justin hitting and stabbing Carlos; Cora and Justin fighting loudly, preventing Carlos from sleeping; Cora calling Carlos names.**[8]**  These examples are not passive or careless; they are active and purposeful — the opposite of behavior that may appropriately be called neglectful.

My disagreement with the court is based on this evidence.  The superior court did not find that OCS had offered sufficient evidence to prove any of the other bases on which it alleged Carlos was in need of aid.  Instead the court looked at all of the evidence offered and concluded that, when considered together, it added up to

---

**[5]**        *Neglect*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (3d ed. 2002).

**[6]**        *Neglect*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2016).

**[7]**        Opinion at 16.

**[8]**        *Id.*

neglect.  I disagree with the court's conclusion.  While I agree with the principle that the evidence may be aggregated, it is only the evidence relevant to the particular subsection at issue that matters.  Where, as here, evidence demonstrates that the parents assaulted their child and each other, that evidence is not part of the sum of evidence showing the parents neglected the child.  I therefore respectfully dissent.